ORAL ARGUMENT NOT YET SCHEDULED
Nos. 13-5247, 13-5248

_____

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

State National Bank of Big Spring, *et al.*,
*Plaintiffs-Appellants*,

v.

Jacob J. Lew, *et al.*,
*Defendants-Appellees.*

_____

On Appeal from the U.S. District Court for the District of Columbia
No. 1:12-cv-001032-ESH, Honorable Ellen S. Huvelle

_____

**OPENING BRIEF OF PRIVATE PLAINTIFFS-APPELLANTS**

_____

Gregory F. Jacob
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, D.C. 20006
Telephone: (202) 383-5300

C. Boyden Gray
Adam J. White
Adam R.F. Gustafson
BOYDEN GRAY & ASSOCIATES P.L.L.C.
1627 Eye Street NW, Suite 950
Washington, D.C. 20006
Telephone: (202) 955-0620

*Counsel for Plaintiffs-Appellants State
National Bank of Big Spring; the 60
Plus Association, Inc.; and Competitive
Enterprise Institute*

Sam Kazman
Hans Bader
COMPETITIVE ENTERPRISE
INSTITUTE
1899 L Street NW, Floor 12
Washington, D.C. 20036
Telephone: (202) 331-1010

*Co-Counsel for Plaintiff-Appellant
Competitive Enterprise Institute*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**Parties**.

1.  The Private Plaintiffs-Appellants in this action are:

    a.  State National Bank of Big Spring;

    b.  The 60 Plus Association; and

    c.  The Competitive Enterprise Institute.

2.  The State Plaintiffs-Appellants in this action are:

    a.  The State of Alabama;

    b.  The State of Georgia;

    c.  The State of Kansas;

    d.  The State of Montana;

    e.  The State of Nebraska;

    f.  The State of Ohio;

    g.  The State of Oklahoma;

    h.  The State of South Carolina;

    i.  The State of Texas;

    j.  The State of West Virginia; and

    k.  Michigan Attorney General Bill Schuette on behalf of the People of Michigan.

3. The Defendants-Appellees in this action are:

   a. Jacob J. Lew, in his official capacities as Secretary of the Treasury and *ex officio* Chairman of the Financial Stability Oversight Council;

   b. The United States Department of the Treasury;

   c. Richard Cordray, in his official capacities as (1) Director of the Consumer Financial Protection Bureau, (2) *ex officio* Director of the Federal Deposit Insurance Corporation, and (3) *ex officio* member of the Financial Stability Oversight Council;

   d. The Consumer Financial Protection Bureau;

   e. Janet Yellen, in her official capacities as Chairman of the Board of Governors of the Federal Reserve System and *ex officio* Member of the Financial Stability Oversight Council;

   f. Janet Yellen, in her official capacity as Vice Chairman of the Board of Governors of the Federal Reserve System, a position now vacant;

   g. Elizabeth Duke, in her official capacity as member of the Board of Governors of the Federal Reserve System, a position now vacant;

   h. Jerome H. Powell, in his official capacity as member of the Board of Governors of the Federal Reserve System, a position now vacant;

i.   Sarah Bloom Raskin, in her official capacity as member of the Board of Governors of the Federal Reserve System;

j.   Jeremy C. Stein, in his official capacity as member of the Board of Governors of the Federal Reserve System;

k.   Daniel K. Tarullo, in his official capacity as member of the Board of Governors of the Federal Reserve System;

l.   The Board of Governors of the Federal Reserve System;

m.   Martin J. Gruenberg, in his official capacities as Chairman of the Board of Directors of the Federal Deposit Insurance Corporation and *ex officio* Member of the Financial Stability Oversight Council;

n.   Thomas M. Hoenig, in his official capacity as Vice Chairman of the Federal Deposit Insurance Corporation;

o.   Jeremiah Norton, in his official capacity as Director of the Federal Deposit Insurance Corporation;

p.   Thomas J. Curry, in his official capacities as (1) U.S. Comptroller of the Currency, (2) *ex officio* Director of the Federal Deposit Insurance Corporation, and (3) *ex officio* member of the Financial Stability Oversight Council;

q.   The Federal Deposit Insurance Corporation;

r.  Mary Jo White, in her official capacities as Chairman of the U.S. Securities and Exchange Commission and *ex officio* member of the Financial Oversight Council;

s.  Mark P. Wetjen, in his official capacities as Acting Chairman of the U.S. Commodity Futures Trading Commission and *ex officio* member of the Financial Stability Oversight Council;

t.  Debbie Matz, in her official capacities as Chairman of the National Credit Union Administration Board and *ex officio* Member of the Financial Stability Oversight Council;

u.  S. Roy Woodall, in his official capacity as Member of the Financial Stability Oversight Council;

v.  The Financial Stability Oversight Council.

**Rulings Under Review**.  Appellants seek review of the August 1, 2013, Order of the District Court for the District of Columbia (Honorable Ellen S. Huvelle) granting defendants' motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  (R. 43-44).  The district court's memorandum opinion is reported at 2013 WL 3945027, and 2013 U.S. Dist. LEXIS 108308.

**Related Cases**.  This case has not previously been before this Court.  In *Morgan Drexen, Inc. v. CFPB*, No. 13-5342 (D.C. Cir.), different plaintiffs have challenged the constitutionality of the Consumer Financial Protection Bureau, as Private Plaintiffs do in Count I of their Second Amended Complaint.  Similar

iv

litigation is also taking place in *CFPB v. Morgan Drexen, Inc.*, No. 13-01267 (C.D. Cal.).

In *Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013), this Court held that certain Executive Branch "recess" appointments made on January 4, 2012, were invalid, as Private Plaintiffs allege in Count II of their Second Amended Complaint. Similar holdings were reached by the Third Circuit in *NLRB v. New Vista Nursing & Rehabilitation*, 719 F.3d 203 (3d Cir. 2013), and the Fourth Circuit in *NLRB v. Enterprise Leasing Co. Southeast, LLC*, 722 F.3d 609 (4th Cir. 2013). The recess appointment issue is currently before the Supreme Court in *NLRB v. Noel Canning*, No. 12-1281.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Private Plaintiffs-Appellants make the following disclosures:

State National Bank of Big Spring (the "Bank") is a federally-chartered bank.  It has one parent company, SNB Delaware Financial, Inc., a Bank Holding Company in Dover, Delaware.  SNB Delaware Financial, in turn, has one parent company, SNB Financial, Inc., a Texas Corporation and Bank Holding Company in Big Spring, Texas.  No publicly held company has 10 percent or greater ownership of the Bank.

The 60 Plus Association, Inc. (the "Association") is a non-profit, non-partisan seniors advocacy group that is tax exempt pursuant to Section 501(c)(4) of the Internal Revenue Code.  The Association has no parent corporation, and no publicly held company has 10 percent or greater ownership of the Association.

Competitive Enterprise Institute ("CEI") is a non-profit public interest organization that is tax-exempt pursuant to Section 501(c)(3) of the Internal Revenue Code.  CEI has no parent corporation, and no publicly held company has 10 percent or greater ownership of CEI.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

CORPORATE DISCLOSURE STATEMENT ......................................vi

TABLE OF AUTHORITIES ...............................................ix

GLOSSARY............................................................ xvii

JURISDICTIONAL STATEMENT ...........................................1

STATEMENT OF ISSUES ...............................................1

STATUTES AND REGULATIONS ..........................................2

STATEMENT OF THE CASE..............................................2

    A.    Regulatory Background ........................................3

        1.    Title X: The Bureau ...................................3

        2.    The "Recess" Appointment .............................7

        3.    Title I: The Council .................................7

    B.    The Bank ....................................................9

    C.    Procedural History .........................................11

SUMMARY OF ARGUMENT ...............................................16

STANDARD OF REVIEW ...............................................21

ARGUMENT ..........................................................22

I.    THE DISTRICT COURT ERRED IN HOLDING THE BANK LACKS STANDING TO CHALLENGE THE FORMATION AND OPERATION OF THE BUREAU ...........................................22

    A.    Bureau-Imposed Compliance Costs Confer Standing ............22

        1.    The Bank's Compliance Costs Are an Injury-In-Fact........................................................23

        2.    The Compliance Costs Are Traceable to Title X and Redressable by the Court .........................27

    B.    The Increased Costs of Remittance Transfers and Mortgage Servicing Give the Bank Standing .........................30

        1.    The Remittance Rule ..................................30

        2.    The Foreclosure Rule.................................32

# TABLE OF CONTENTS
(continued)

**Page**

C.   The Bank's Lost Profits in the Mortgage Market Provide
     Standing ...................................................................................35

     1.   The Escrow Rule.................................................................36

     2.   The Ability-to-Repay Rule ...............................................37

     3.   The "UDAAP" Authority ................................................40

II.   CONTRARY TO THE DISTRICT COURT'S DECISION,
      THE BANK HAS STANDING TO CHALLENGE MR.
      CORDRAY'S UNCONSTITUTIONAL "RECESS"
      APPOINTMENT.................................................................................45

III.  THE DISTRICT COURT WRONGLY HELD THE BANK
      LACKS STANDING TO CHALLENGE THE FORMATION
      AND OPERATION OF THE COUNCIL...........................................46

      A.   SIFI Designations Injure the Bank...........................................46

      B.   The Bank's Injuries Are Fairly Traceable to the
           Council's Designations and Ripe for Review..........................51

CONCLUSION ...........................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Already, LLC v. Nike, Inc.*,
  133 S. Ct. 721 (2013)............................................................50

*\*Ams. for Safe Access v. DEA*,
  706 F.3d 438 (D.C. Cir. 2013)................................................ 21, 51

*\*Ass'n of Am. R.Rs. v. DOT*,
  38 F.3d 582 (D.C. Cir. 1994)............................................ 17, 23, 24

*\*Ass'n of Am. R.Rs. v. DOT*,
  721 F.3d 666 (D.C. Cir. 2013)......................................... 19, 32, 39, 41

*\*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
  681 F.3d 427 (D.C. Cir. 2012)........................................... 23, 27, 31

*Bennett v. Spear*,
  520 U.S. 154 (1997)............................................................36

*Bristol-Myers Squibb Co. v. Shalala*,
  91 F.3d 1493 (D.C. Cir. 1996).............................................. 37, 50

*Cablevision Sys. Corp. v. FCC*,
  649 F.3d 695 (D.C. Cir. 2011)................................................39

*Cellco P'ship v. FCC*,
  357 F.3d 88 (D.C. Cir. 2004).................................................23

*\*Chamber of Commerce v. SEC*,
  443 F.3d 890 (D.C. Cir. 2006)........................................... 18, 32, 37

*\*Chambers Med. Techs. of S.C., Inc. v. Bryant*,
  52 F.3d 1252 (4th Cir. 1995) ............................................. 17, 25

*Clapper v. Amnesty International USA*,
  133 S. Ct. 1138 (2013)................................................... 28, 41

\* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Columbia Broad. Sys. v. United States*,
316 U.S. 407 (1942)................................................................44

*Constellation Energy Commodities Grp., Inc. v. FERC*,
457 F.3d 14 (D.C. Cir. 2006)....................................................43

*Edmond v. U.S. Postal Serv. Gen. Counsel*,
949 F.2d 415 (D.C. Cir. 1991)..................................................37

*Equal Rights Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011)................................... 17, 27, 31

*Exxon Co. USA v. FERC*,
182 F.3d 30 (D.C. Cir. 1999)....................................................46

*FEC v. Legi-Tech, Inc.*,
75 F.3d 704 (D.C. Cir. 1996)....................................................45

*FEC v. NRA Political Victory Fund*,
513 U.S. 88 (1994)...................................................................45

*Franchise Tax Bd. of Ca. v. Alcan Aluminum Ltd.*,
493 U.S. 331 (1990).................................................................27

*Frederick Cnty. Fruit Growers Assoc. v. Martin*,
968 F.2d 1265 (D.C. Cir. 1992)....................................... 18, 30

*Free Enter. Fund v. PCAOB*,
130 S. Ct. 3138 (2010)................................. 19, 20, 29, 39, 45

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
528 U.S. 167 (2000)......................................................... 36, 52

*Great Lakes Gas Transmission Ltd. P'ship v. FERC*,
984 F.2d 426 (D.C. Cir. 1993)....................................... 19, 38, 42

*Grocery Mfrs. Ass'n v. EPA*,
693 F.3d 169 (D.C. Cir. 2012)..................................................22

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Haase v. Sessions*,
   835 F.2d 902 (D.C. Cir. 1987)................................................................34

*Idaho Power Co. v. FERC*,
   312 F.3d 454 (D.C. Cir. 2002)...................................................... 18, 35

*Ill. State Chamber of Commerce v. EPA*,
   775 F.2d 1141 (7th Cir. 1985)............................................................32

*In re Sealed Case*,
   494 F.3d 139 (D.C. Cir. 2007)...................................................... 20, 48

*Int'l Union, United Mine Workers of Am. v. Dep't of Labor*,
   358 F.3d 40 (D.C. Cir. 2004)..............................................................30

*KERM, Inc. v. FCC*,
   353 F.3d 57 (D.C. Cir. 2004)..............................................................48

*Laroque v. Holder*,
   650 F.3d 777 (D.C. Cir. 2011).................................................. 16, 22, 33, 40, 49

*Liberty University, Inc. v. Lew*,
   733 F.3d 72 (4th Cir. 2013) ..............................................................24

*Markva v. Haveman*,
   317 F.3d 547 (6th Cir. 2003) ...................................................... 21, 50

*Massachusetts v. EPA*,
   549 U.S. 497 (2007).........................................................................22

*Meese v. Keene*,
   481 U.S. 465 (1987)................................................................. 21, 51

*Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*,
   501 U.S. 252 (1991).........................................................................41

*Mobile Relay Assocs. v. FCC*,
   457 F.3d 1 (D.C. Cir. 2006)...............................................................49

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
  417 F.3d 1272 (D.C. Cir. 2005) ..................................................... 19, 39

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
  440 F.3d 459 (D.C. Cir. 2006) ............................................................21

*Nat'l Fed'n of Fed. Emps. v. United States,*
  905 F.2d 400 (D.C. Cir. 1990) ...........................................................24

*Nat'l Parks Conservation Ass'n v. Manson,*
  414 F.3d 1 (D.C. Cir. 2005) ...............................................................36

*Ne. Energy Assocs. v. FERC,*
  158 F.3d 150 (D.C. Cir. 1998) ...........................................................29

*New World Radio, Inc. v. FCC,*
  294 F.3d 164 (D.C. Cir. 2002) ..................................................... 46, 48

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  259 F.3d 154 (3d Cir. 2001) ...............................................................38

*Nguyen v. United States,*
  539 U.S. 69 (2003) ...................................................................... 20, 45

*Noel Canning v. NLRB,*
  705 F.3d 490 (D.C. Cir. 2013) .............................................................7

*Okla. Dep't of Envtl. Quality v. EPA,*
  --- F.3d ---, 2014 WL 184624 (D.C. Cir. Jan. 17, 2014) ............................. 17, 29

*Pac. Legal Found. v. Goyan,*
  664 F.2d 1221 (4th Cir. 1981) ....................................... 17, 23, 25, 26

*Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards,*
  128 F.3d 910 (5th Cir. 1997) ...............................................................32

*Raytheon Co. v. Ashborn Agencies, Ltd.,*
  372 F.3d 451 (D.C. Cir. 2004) ............................................................27

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Riggs Nat'l Corp. & Subsidiaries v. Comm'r of Internal Revenue Serv.*,
   163 F.3d 1363 (D.C. Cir. 1999) ............................................................................49

\*Rio Grande Pipeline Co. v. FERC,
   178 F.3d 533 (D.C. Cir. 1999) ................................................. 19, 38, 42

\*Sabre, Inc. v. DOT,
   429 F.3d 1113 (D.C. Cir. 2005) ............................................... 43, 44

Seegars v. Gonzales,
   396 F.3d 1248 (D.C. Cir. 2005) ..........................................................43

\*Settles v. U.S. Parole Comm'n,
   429 F.3d 1098 (D.C. Cir. 2005) ............................................... 21, 34

\*Shays v. FEC,
   414 F.3d 76 (D.C. Cir. 2005) .................................................... 20, 46

Sherley v. Sebelius,
   610 F.3d 69 (D.C. Cir. 2010) ...........................................................46

Skinner v. Switzer,
   131 S. Ct. 1289 (2011) ..................................................................33

Smith v. Pac. Prop. & Dev. Corp.,
   358 F.3d 1097 (9th Cir. 2004) .........................................................25

Smith v. Pro Football, Inc.,
   593 F.2d 1173 (D.C. Cir. 1978) ......................................................50

\*Spann v. Colonial Vill., Inc.,
   899 F.2d 24 (D.C. Cir. 1990) ................................................. 17, 23, 23

\*Tozzi v. U.S. Dep't of Health & Human Servs.,
   271 F.3d 301 (D.C. Cir. 2001) .............................................. 21, 50, 51

\*U.S. Telecom Ass'n v. FCC,
   295 F.3d 1326 (D.C. Cir. 2002) ............................................. 47, 52

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Storer Broad. Co.*,
  351 U.S. 192 (1956)................................................................42

*Warth v. Seldin*,
  422 U.S. 490 (1975)........................................................ 16, 22

## STATUTES

12 U.S.C. § 1813 ...................................................................6

12 U.S.C. § 5322 ...................................................................7

12 U.S.C. § 5323 .................................................................7, 8

12 U.S.C. § 5481 ...................................................................6

12 U.S.C. § 5491 ...................................................................3

12 U.S.C. § 5516 ............................................................ 6, 7, 36

12 U.S.C. § 5531 ............................................................... 5, 36

12 U.S.C. § 5536 ...................................................................5

12 U.S.C. § 5565 ............................................................... 5, 44

15 U.S.C. § 1639c .................................................................4

15 U.S.C. § 1639d .................................................................5

28 U.S.C. § 1291 ...................................................................1

28 U.S.C. § 1331 ...................................................................1

Tex. Prop. Code Ann. § 51.002 ............................................10

## REGULATIONS

12 C.F.R. § 1005.30 ...............................................................3

12 C.F.R. § 1024.41 ...............................................................4

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

12 C.F.R. § 1026.35 ................................................................5

12 C.F.R. § 1026.43 ................................................................4

12 C.F.R. § 1310.1 .................................................................8

76 Fed. Reg. 64,264 (proposed Oct. 18, 2011)................................8

77 Fed. Reg. 6,194 (Feb. 7, 2012) .............................................3

77 Fed. Reg. 21,637 (Apr. 11, 2012) ..........................................8

77 Fed. Reg. 50,244 (Aug. 20, 2012) ................................. 3, 18, 31

78 Fed. Reg. 4,726 (Jan. 22, 2013) ..................................... 4, 37

78 Fed. Reg. 6,408 (Jan. 30, 2013) ...........................................4

78 Fed. Reg. 10,696 (Feb. 14, 2013) ..........................................3

78 Fed. Reg. 35,430 (June 12, 2013) ............................. 4, 19, 26, 38

78 Fed. Reg. 53,734 (Aug. 30, 2013) .........................................45

## OTHER AUTHORITIES

159 Cong. Rec. S5,698-705 (daily ed. July 16, 2013)..........................7

*CFPB v. Am. Debt Settlement Solutions, Inc.*,
    No. 09:13-cv-80548 (S.D. Fla. May 30, 2013)...............................5

*CFPB v. Castle & Cooke Mortg.*,
    No. 13-0684 (D. Utah) ....................................................35

Consumer Financial Protection Bureau,
    http://www.consumerfinance.gov/blog/final-list-of-rural-and-underserved-
    counties-for-use-in-2014/...............................................5

Peter Conti-Brown, *Elective Shareholder Liability*, 64 Stan L. Rev. 409 (2012)...48

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Nizan Geslevich Packin, *It's (Not) All About the Money: Using Behavioral Economics to Improve Regulation of Risk Management in Financial Institutions*, 15 U. Pa. J. Bus. L. 419 (2013).............................................................48

Maziar Peihani, *Systemically Important Financial Institutions (SIFIs): An Analysis of Current Regulatory Developments*, 29 Banking & Fin. L. Rev. 129 (2013) ...48

David Skeel, The New Financial Deal: Understanding the Dodd-Frank Act and Its (Unintended) Consequences 9 (2011) ................................................................48

Pierre-Hugues Verdier, *The Political Economy of International Financial Regulation*, 88 Ind. L.J. 1405 (2013)...................................................................48

M. Patrick Yingling, *Conventional and Unconventional Corruption*, 51 Duq. L. Rev. 263 (2013) ...................................................................................48

# GLOSSARY

| | |
|---|---|
| The Bank | State National Bank of Big Spring |
| CFPB | Consumer Financial Protection Bureau |
| CEI | Competitive Enterprise Institute |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (codified as amended in scattered sections of the U.S. Code) |
| FSOC | Financial Stability Oversight Council |
| GE Capital | GE Capital Unit of General Electric |
| OCC | Office of the Comptroller of the Currency |
| OSHA | Occupational Safety and Health Administration |
| SAC | Second Amended Complaint |
| SIFI | Systemically Important Financial Institution |
| UDAAP | Unfair, deceptive, or abusive acts or practices |

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331.  It dismissed the operative complaint on August 1, 2013, finally disposing of the case. Appellants State National Bank of Big Spring (the "Bank"), the Competitive Enterprise Institute, and the 60 Plus Association (collectively, "Private Plaintiffs") timely filed a notice of appeal on August 2, 2013.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

The questions presented are whether the district court erred when it concluded that:

1.     Private Plaintiffs lack standing to challenge the unconstitutional formation and operation of the Consumer Financial Protection Bureau (the "Bureau");

2.     Private Plaintiffs lack standing to challenge the unconstitutional "recess" appointment of Richard Cordray to serve as Bureau Director;

3.     Private Plaintiffs lack standing to challenge the unconstitutional formation and operation of the Financial Stability Oversight Council (the "Council"); and

4.     Private Plaintiffs' challenge to the Council and injuries from the Bureau's remittance and mortgage rules are not ripe.

1

## STATUTES AND REGULATIONS

All applicable provisions are reprinted in the Statutory Addendum.

## STATEMENT OF THE CASE

This appeal stems from constitutional challenges Private Plaintiffs have raised to agencies created by the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") that regulate the Bank and its competitors. The questions presented are straightforward: (1) Does an entity that has been forced at significant expense to comply with new agency regulation have standing to challenge that agency as unconstitutional? (2) Does a company have standing to challenge government action that benefits a direct competitor and harms the company? The Bank, which falls squarely within the Bureau's regulatory authority, has been forced to spend tens of thousands of dollars to ensure that it does not run afoul of federal law as interpreted and applied by the Bureau, and the Council has bestowed a recognized subsidy on the Bank's competitors that puts the Bank at a competitive disadvantage. Those realities are not just "life," as the district court suggested. (Motion to Dismiss Hearing Tr. 47). They are concrete injuries-in-fact that firmly establish the Bank's standing to bring suit.

2

## A.    Regulatory Background

### 1.    *Title X: The Bureau*

Title X of the Dodd-Frank Act creates the CFPB, an "independent bureau" within the Federal Reserve System charged with "regulat[ing] the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a).  The Bureau has already taken several actions to regulate banks' operations.

*The Remittance Rule*.  The Bureau imposes substantial disclosure and reporting requirements on "any person that provides remittance transfers"—money transfers from consumers in the United States to parties abroad—"in the normal course of its business." *Electronic Fund Transfers (Regulation E)*, 77 Fed. Reg. 6,194, 6,285 (Feb. 7, 2012), *modified by* 77 Fed. Reg. 50,244 (Aug. 20, 2012) (codified at 12 C.F.R. § 1005.30(f)).  The Bureau's original rule lacked a safe harbor for entities that performed a small number of transfers, although subsequent revisions exempted providers that offer fewer than 100 transfers annually.  77 Fed. Reg. at 50,282.

*The Foreclosure Rule*.  The Bureau prohibits lenders from taking any foreclosure action on a delinquent consumer mortgage loan until 120 days after the lender sends an initial notice required by the Bureau's regulation.  *Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X)*,

3

78 Fed. Reg. 10,696, 10,885 (Feb. 14, 2013) (codified at 12 C.F.R. § 1024.41(f) & (j)).

*The Ability-to-Repay Rule*.  The Dodd-Frank Act mandates that lenders assess a borrower's ability to repay a mortgage before issuing the loan and provides that a lender that issues a "qualified mortgage" is presumed to have adequately assessed ability to repay.  15 U.S.C. § 1639c(a)(1), (b).  The Bureau defined "qualified mortgages" in the Ability-to-Repay Rule by creating a safe harbor for loans with interest rates less than 1.5 percentage points over the Average Prime Offer Rate.  Loans with higher rates were given only a "rebuttable presumption" of compliance that made them subject to litigation by the individual borrowers to whom the loans were made.  *Ability-to-Repay and Qualified Mortgage Standards Under the Truth in Lending Act (Regulation Z)*, 78 Fed. Reg. 6,408, 6,510 (Jan. 30, 2013), *amended by* 78 Fed. Reg. 35,430, 35,503 (June 12, 2013) (codified at 12 C.F.R. § 1026.43(b)(4), (e)(1)).  Subsequent amendments raised the safe harbor to 3.5 percentage points over that rate.  78 Fed. Reg. at 35,503.

*The Escrow Rule*.  The Bureau prohibits lenders from extending "higher-priced mortgage loans"—mortgages with interest rates at least 1.5 to 3.5 percentage points over the Average Prime Offer Rate—unless the lender first establishes an escrow account for paying property taxes and insurance.  *Escrow*

*Requirements Under the Truth in Lending Act (Regulation Z)*, 78 Fed. Reg. 4,726,

4,753 (Jan. 22, 2013) (codified at 12 C.F.R. § 1026.35(b)(1)).  Congress authorized

the Bureau to except small banks serving rural and underserved communities from

this expensive requirement.  *See* 15 U.S.C. §1639d(c).  The Bureau, however, did

not include Howard County, Texas (the county in which the Bank primarily

operates) on the "rural" or "underserved" exemption list for 2014.  *See*

http://www.consumerfinance.gov/blog/final-list-of-rural-and-underserved-

counties-for-use-in-2014/.

   *The UDAAP Authority*.  Title X prohibits covered entities (including the

Bank) from engaging in "unfair, deceptive, or abusive act[s] or practice[s]" and

authorizes the Bureau to promulgate rules that define such practices.  12 U.S.C.

§§ 5531(a), 5536(a)(1)(B); (Op. 30-31) (describing this "UDAAP" authority).  The

Act subjects providers who violate the law to penalties of thousands of dollars a

day and empowers the Bureau to take action against such practices.  12 U.S.C.

§ 5565(c)(1)-(c)(2).

   The Bureau has in fact been actively enforcing this provision, imposing

millions of dollars of fines and restitution costs on entities for engaging in such

practices.  *See, e.g.*, *CFPB v. Am. Debt Settlement Solutions, Inc.*, No. 09:13-cv-

80548 (S.D. Fla. May 30, 2013).  The Bureau has, however, refused to define what

it believes constitutes an unfair, deceptive, or abusive practice.  Instead, Mr.

Cordray has stated that the phrase is "a little bit of a puzzle" that the Bureau will not define ex ante "in the abstract"; rather, the Bureau will rely on ad hoc "facts and circumstances" determinations of illegality as "situations may arise." (SAC ¶ 75).

*Supervisory Authority.* Title X also grants the Bureau certain supervisory powers over small lending institutions (including the Bank). These small lenders are primarily supervised by other agencies known as "prudential regulators"—in the case of the Bank, the Office of the Comptroller of the Currency. 12 U.S.C. §§ 1813(q)(1), 5481(24). Title X authorizes the Bureau to add to that supervision by:

(1) requiring a lender to submit reports about its activities, 12 U.S.C. § 5516(b);

(2) using the Bureau's own "examiners on a sampling basis" to review the lender's activities "to assess compliance" with the law, *id.* § 5516(c)(1);

(3) referring lender activity the Bureau deems "a material violation of a Federal consumer financial law" to the lender's prudential regulator, *id.* § 5516(d)(2)(A) & (B); and

(4) recommending to the prudential regulator "appropriate action to respond" to the allegedly unlawful activity, thereby requiring that

6

regulator to "provide a written response to the Bureau" about the

matter "not later than 60 days thereafter," *id*. § 5516(d)(2)(A) & (B).

### 2.      *The "Recess" Appointment*

On January 4, 2012, President Obama announced the intra-session "recess"

appointment of Mr. Cordray to serve as Director of the Bureau.  Mr. Cordray

immediately assumed the post without the Senate's advice and consent, even

though the Senate was not in recess.  *See* (SAC ¶¶ 124-34); *Noel Canning v.

NLRB*, 705 F.3d 490 (D.C. Cir. 2013).  The Senate did not confirm Mr. Cordray

until July 16, 2013.  159 Cong. Rec. S5,698-705 (daily ed. July 16, 2013).  In the

intervening sixteen months, Mr. Cordray signed several regulations, including the

Remittance, Foreclosure, Escrow, and Ability-to-Repay Rules.

### 3.      *Title I: The Council*

Title I of the Dodd-Frank Act establishes the FSOC, an interagency

"council" with broad power to remedy threats to the nation's financial stability.  12

U.S.C. § 5322(a), (d).  As part of its oversight authority, the Council can determine

that any "nonbank financial company"—generally a financial institution that

provides banking services but does not hold a banking license—constitutes a

"threat to the financial stability of the United States."  *Id*. § 5323(a)(1).

Colloquially known as systemically important financial institutions, or "SIFIs,"[1] these officially-designated entities are perceived by the market as "too big to fail"—i.e., government-backed and protected against failure. *See* (SAC ¶¶ 142-49; First Jacob Decl., Ex. 1 at 2-3). Because SIFIs are viewed as less risky investments, they are able to attract investment capital at artificially low rates. This results in a subsidy for SIFIs and a tax on non-designated competitors. *See* (SAC ¶¶ 142-49; First Jacob Decl., Ex. 1 at 2-3) (collecting sources on SIFI subsidy).

Although SIFI designation carries these serious consequences, Title I provides the Council with virtually unlimited discretion to determine which companies are systemically important and limits judicial review of those designations, which may not be challenged by competitors or other third parties. *See* 12 U.S.C. § 5323(a)(2)(K), (h); (SAC ¶¶ 154-57). The Council has designated multiple companies as SIFIs, including the GE Capital Unit of General Electric ("GE Capital"). (Second Supp. Decl. of Gregory Jacob).

---

[1] Although the Dodd-Frank Act does not include the phrase "systemically important financial institution," the term long has been used to describe too-big-to-fail entities and appears in the Council's rulemaking. *E.g.*, *Authority to Require Supervision and Regulation of Certain Nonbank Financial Companies*, 76 Fed. Reg. 64,264, 64,267 (proposed Oct. 18, 2011), *adopted by* 77 Fed. Reg. 21,637, 21,639 (Apr. 11, 2012) (attendant rules codified at 12 C.F.R. § 1310.1 *et seq.*).

### B.    The Bank

State National Bank is a local lending institution that serves West Texas, primarily Howard County.  The Bank offers many consumer financial services, including remittance transfers, checking accounts, and agricultural and vehicle loans.  Although the Bank stopped offering new consumer mortgages due to the creation and operation of the Bureau, the Bank continues to service consumer mortgage loans it previously issued.  (SAC ¶¶ 14-15; Purcell Decl. ¶ 36; Second Purcell Decl. ¶ 10).

1.  As pleaded below, the creation and operation of the Bureau has increased the Bank's costs of doing business in several ways.

*First*, the Bureau's expansive regulatory and enforcement powers have forced the Bank to incur significant costs to remain in compliance with the law.  Among other things, since Title X was enacted the Bank has spent roughly $10,000 annually to subscribe to the Texas Bankers Association's "Compliance Alliance," a service that counsels subscribers regarding Bureau regulations, interpretations, and enforcement actions, as well as eligibility for regulatory safe harbors.  (Purcell Decl. ¶¶ 7-9).

*Second*, the Bureau's regulations have significantly impacted the Bank's remittance and mortgage servicing businesses.  In 2010, the Bank was forced to stop offering remittance transfers because it could not afford to comply with the

9

Original Remittance Rule.  Under the Revised Remittance Rule, the Bank offers transfers but is forced to limit them to ninety-nine annually.  (*Id.* ¶¶ 17-19).

The Bureau's Foreclosure Rule has increased the costs of servicing the Bank's currently outstanding mortgages.  Under previously applicable state law, the Bank could initiate foreclosure sale proceedings on a defaulted loan if the borrower did not cure his default within 20 days of a notification letter.  Tex. Prop. Code Ann. § 51.002(a), (b), (d).  Even if the Bank hoped it would not ultimately have to foreclose, posting a sale notice soon after default was a useful tool to induce borrowers to get current on their payments quickly.  (Purcell Decl. ¶¶ 35-38).  The Foreclosure Rule bans that practice.

*Third*, the Bank previously maintained a profitable consumer-mortgage lending practice, but it was forced to leave that market and has been unable to reenter it as a result of the costs and risks imposed by the Bureau.  (SAC ¶¶ 78-79; Purcell Decl. ¶ 38).  The Bureau's Escrow Rule, for instance, increases the expense of offering covered consumer mortgages by requiring a costly escrow account. (Private Pls.' Supp. Br. at 3 (Doc. 38)).  The Bureau's Ability-to-Repay Rule subjects higher-priced mortgages—which include mortgages the Bank previously offered (Second Purcell Decl. ¶ 10)—to a serious threat of litigation by third parties or the government.  And the Bureau's enforcement authority, combined with its unwillingness to define what constitutes an unfair, deceptive, or abusive

10

practice, has left the Bank uncertain whether loans it offered—including "character loans," which are based not only on ability to repay but also on credibility, character, and ties to the community—could be deemed prohibited and subject the Bank to thousands of dollars in penalties daily.  (SAC ¶¶ 16-17, 77, 91, 94-96; Purcell Decl. ¶¶ 25, 32; Second Purcell Decl. ¶ 10).  "[B]ut for the Bureau, its rules, and its enforcement authority, the Bank would reenter" the consumer mortgage market without limitation.  (Purcell Decl. ¶ 38).

2.  The Bank has also been injured by the Council's SIFI designations, including designation of the Bank's competitor, GE Capital.  Both the Bank and GE Capital offer agricultural loans in the Odessa region of West Texas.  (Second Purcell Decl. ¶ 11).  And both offer consumer accounts—they accept monetary deposits and pay interest on deposits, allowing customers to access their money, write checks, and transfer funds electronically.  (*Id.* ¶ 17).  Customers, including those in West Texas, can apply for and fund GE Capital accounts directly online. (*Id.*).

### C.    Procedural History

On June 21, 2012, Private Plaintiffs filed their original complaint, challenging as unconstitutional (1) the formation and operation of the Bureau; (2) the "recess" appointment of Director Cordray; and (3) the creation and operation of the Council.  (Compl. ¶¶ 1-3).  Private Plaintiffs alleged that the Bureau and

Council violated the constitutionally mandated separation of powers, and that Mr. Cordray's appointment was made unlawfully without the Senate's advice and consent.

On September 20, 2012, Private Plaintiffs filed a First Amended Complaint that added Michigan Attorney General Bill Schuette, on behalf of the People of Michigan, and the States of Oklahoma and South Carolina as plaintiffs. The State Plaintiffs joined only a new section of the complaint challenging the creation and operation of the Orderly Liquidation Authority under Title II of the Dodd-Frank Act.

On February 20, 2013, Plaintiffs filed the operative Second Amended Complaint, which joined as plaintiffs the States of Alabama, Georgia, Kansas, Montana, Nebraska, Ohio, Texas, and West Virginia. The State Plaintiffs again challenged only Title II; Private Plaintiffs challenged all three Titles and Mr. Cordray's appointment.

On February 22, 2013, the government filed a motion to dismiss the Second Amended Complaint. It argued Plaintiffs lacked standing and their claims were not ripe. The district court granted the motion.

1. The court rejected the Bank's argument that its significant new compliance costs constitute an injury-in-fact. The court believed a compliance cost "is typically the cost a regulated party incurs to satisfy a legal mandate[,] not

12

the cost … to determine whether it needs to satisfy a legal mandate," (Op. 37-38) (emphasis and quotation marks omitted), and suggested the Bank's costs were "voluntarily incurred to keep track of the CFPB's activities, not to actually comply with any regulations."  (Op. 39).  The court recognized the possibility that Fourth Circuit precedents could "be read to justify the Bank's theory of standing" but was "unwilling to accept their rationale."  (Op. 40).

The court alternatively held the Bank's compliance costs to be a self-inflicted injury.  The court reasoned the Bank could have devoted resources to finding information "from the Bureau's … website" instead of spending money on compliance services.  (Op. 41).  And the court concluded the injury was not redressable, because if Title X were invalidated, "the Bank presumably would still have to spend money to learn about its compliance responsibilities" under other laws.  (*Id.*).

The district court next held the Bank was not injured by the original Remittance Rule (which forced the Bank out of the market) because the court believed promulgation of a regulatory safe harbor was "all but inevitable."  (Op. 43).  The court also concluded the Bank could not claim it was injured by limiting the transfers it would conduct annually under the new rule because the Bank's past practice fell within the safe harbor.  (Op. 42-43).  Because the court believed the

Bank had no "imminent" remittance injury, it held the Bank's claim unripe.  (Op. 44).

The district court also rejected the Bank's claim of injury from the Foreclosure Rule.  Although the Bank pleaded that the rule "will increase the Bank's costs by drawing out the process by which the Bank may seek to recover on a defaulted loan," the court faulted the Bank for not separately reiterating that "its existing mortgages are actually subject" to the rule.  (Op. 46-47).  The court also deemed it "speculative" whether the rule would increase the Bank's costs, because evidence submitted by the government suggested that the Bank's mortgages had not recently been in default.  (Op. 47).  Accordingly, the court believed "the record does not support the Bank's claim that the rule would impose additional costs." (Op. 48).

The district court failed to discuss the costs imposed by the Escrow Rule.

The court did address the Ability-to-Repay Rule but concluded it could not support standing because: (1) it was not promulgated when the suit was filed (although it was issued before the operative complaint); (2) it was not expressly cited in the operative complaint; (3) the rule applied to few mortgages; (4) litigants might not sue under the rule, so the allegation that the rule imposes "an additional risk factor that would affect the costs and structure" of the Bank's loans "lacks plausibility"; and (5) any injury "faces a redressability problem," because even if

14

the Bureau were dismantled, "it is arguable" rulemaking authority "could revert to the Federal Reserve Board," which the court apparently believed would issue a similar regulation. (Op. 48-51). In addition, the court thought the Ability-to-Repay Rule was "a work in progress," so "considerations of prudential ripeness" counseled against review. (Op. 51-52).

The court also rejected the Bank's reliance on the Bureau's UDAAP authority. Because the Bank exited the mortgage market before the Bureau actually "used its UDAAP authority to regulate mortgages," the court believed it could "only infer that the Bank's generalized fear (or dislike) of the law" provided the Bank's "primary motivation" for staying out of the market. (Op. 53, 55). The court recognized circuit precedent finding standing when "it is reasonably certain that the company's business decisions will be affected" by regulation, even if that regulation has not yet been enforced, but it concluded that the Bank's exit from the market was premature and thus a "self-inflicted" injury. (Op. 56-59) (quotations omitted). Furthermore, although the court acknowledged precedent from this Court "suggesting that an injury can be based on an agency action that causes a plaintiff to be exposed to additional risks, which in turn affect the plaintiff's business decisions," the court attempted to distinguish those cases as involving agency actions with "concrete consequences" for the plaintiffs in question— something the court did not believe present here. (Op. 60-61).

15

2.  Turning to the Council, the district court held the Bank lacked standing because it had not made a "*concrete showing*" that it was a direct and current competitor of GE Capital harmed by the Council's SIFI designation.  (Op. 14).  Despite myriad sources recognizing the subsidy granted by SIFI status, the court deemed it "conjecture" "whether SIFI designation will mean anything."  (Op. 12-13).  The court also rejected the Bank's standing as "requir[ing] guesswork as to how independent decisionmakers will exercise their judgment."  (Op. 14).  And the court concluded "the Bank ha[d] not made an adequate showing" on causation or redressability because large companies "already enjoy a cost-of-capital advantage, even without a formal SIFI designation."  (Op. 14-15).  "For the same reason" the court thought the Bank lacked standing, it concluded the Bank's claim was not ripe.  (Op. 15-16).

The Private Plaintiffs timely filed this appeal, which addresses the justiciability of their claims related to Title I, Title X, and the "recess" appointment.

## SUMMARY OF ARGUMENT

The district court's opinion violates several of the cardinal rules for resolving a motion to dismiss.  It repeatedly fails to "accept as true all material allegations of the complaint," *Warth v. Seldin*, 422 U.S. 490, 501 (1975), and to draw all reasonable inferences in favor of the nonmoving party, *Laroque v. Holder*,

16

650 F.3d 777, 785 (D.C. Cir. 2011). The district court also erred substantively in

holding Private Plaintiffs lack standing:

I. A.  First, precedent from both this Court and other circuits establishes that

the "increased time and expense necessary … to monitor [agency] activities under

new agency regulation" constitutes an injury-in-fact. *Spann v. Colonial Vill., Inc.*,

899 F.2d 24, 28 (D.C. Cir. 1990) (citing *Pac. Legal Found. v. Goyan*, 664 F.2d

1221 (4th Cir. 1981)); *see Ass'n of Am. R.Rs. v. DOT*, 38 F.3d 582, 585-86 (D.C.

Cir. 1994) (per curiam); *Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d

1252, 1265-66 (4th Cir. 1995). In this case, the Bank has been forced to spend tens

of thousands of dollars to ensure that none of its practices violate the Bureau's new

regulations and binding interpretations of federal financial law. Those compliance

costs are a cognizable injury under Article III. They are not, as the district court

held, "self-inflicted"—they are a direct response to the binding Dodd-Frank Act

and the Bureau's regulations. *See Okla. Dep't of Envtl. Quality v. EPA*, --- F.3d

---, 2014 WL 184624, at *4 (D.C. Cir. Jan. 17, 2014); *Equal Rights Ctr. v. Post

Props., Inc.*, 633 F.3d 1136, 1140-41 (D.C. Cir. 2011).

B.  The Remittance Rule has also injured the Bank. The district court

believed the Bank should have anticipated an unpromulgated safe harbor that the

court in hindsight deemed "all but inevitable," but this Court has recognized that

regulated entities cannot reasonably rely on possible rulemakings in planning their

17

affairs.  *Frederick Cnty. Fruit Growers Assoc. v. Martin*, 968 F.2d 1265, 1273

(D.C. Cir. 1992).  Nor does the Bank's ability to remain within the adopted harbor

negate the costs it must incur to ensure it remains there—costs the Bureau itself

has recognized.  Revised Remittance Rule, 77 Fed. Reg. at 50,274-75.

The Bank is additionally harmed by the Foreclosure Rule.  That rule

prohibits a practice the Bank has productively used and wants to continue using,

increasing the costs of servicing mortgages already under contract and preventing

the Bank from reentering the consumer mortgage market.  That is sufficient for

standing.  *Chamber of Commerce v. SEC*, 443 F.3d 890, 896-97 (D.C. Cir. 2006)

(standing to challenge barrier to entry); *Idaho Power Co. v. FERC*, 312 F.3d 454,

459-61 (D.C. Cir. 2002) (standing to challenge agency order dictating how plaintiff

could use property).

C.  The Bureau also has standing to remedy the profits it has lost in the

consumer mortgage market.  To begin, the district court failed even to address the

Escrow Rule, which imposes significant costs and presents another barrier to

reentering the mortgage market.

Although the court addressed the Ability-to-Repay Rule, its analysis was

flawed.  The court deemed it "implausible" that this rule would impact the cost and

structure of Bank loans, but the Bureau itself has recognized that small creditors

may find the litigation authorized by the rule "to be so daunting that they may

18

change their business models to avoid it." Revised Ability-to-Repay Rule, 78 Fed. Reg. at 35,478-79; *accord Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533 (D.C. Cir. 1999) (recognizing that risk of future third-party litigation affected present business decisions). In addition, the district court's conclusion that there was a "redressability problem" because a different agency could adopt a similar rule is foreclosed by Supreme Court precedent, which holds that a court "cannot assume" regulatory action would be the same but for a constitutional defect. *Free Enter. Fund v. PCAOB*, 130 S. Ct. 3138, 3163 n.12 (2010). The Revised Ability-to-Repay Rule has had a concrete effect on the Bank's business practices, preventing it from reentering the mortgage market. The suit is ripe for review. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005); *see Ass'n of Am. R.Rs. v. DOT*, 721 F.3d 666, 672 n.6 (D.C. Cir. 2013).

The district court similarly erred in dismissing the Bank's injury from the Bureau's UDAAP authority. This Court has held that plaintiffs suffer injury-in-fact from "agency action that causes a plaintiff to be exposed to additional risks, which in turn affect the plaintiff's business decisions." (Op. 60); *see Rio Grande*, 178 F.3d at 540; *Great Lakes Gas Transmission Ltd. P'ship v. FERC*, 984 F.2d 426, 430-31 (D.C. Cir. 1993). The district court attempted to distinguish those decisions as involving situations where "the agency *did something* that caused the plaintiff injury" and had a "concrete impact" on the plaintiffs. But that is exactly

19

what has happened here: the Bureau has taken regulatory and enforcement action in the mortgage market, and the increased costs and risks imposed by that action have kept the Bank out of the market.  (SAC ¶¶ 78-79; Purcell Decl. ¶ 38).

II.  The district court held Private Plaintiffs lack standing to challenge Mr. Cordray's appointment for the same reasons they allegedly lack standing to challenge the Bureau.  As explained, that conclusion was erroneous.  The Bank has standing to challenge Mr. Cordray's "recess" appointment.  *Free Enter. Fund*, 130 S. Ct. at 3163 n.12; *Nguyen v. United States*, 539 U.S. 69, 77-83 (2003).

III.  It is well established that plaintiffs have standing when they "face intensified competition" as a result of agency action affecting a relevant market. *Shays v. FEC*, 414 F.3d 76, 86 (D.C. Cir. 2005).  The district court wrongly held the Bank lacked such standing because it had not made a "*concrete showing*" of competitive harm from SIFI designation.  No such evidence is required on a motion to dismiss, *In re Sealed Case*, 494 F.3d 139, 147-48 (D.C. Cir. 2007), and the Bank in fact made that showing through several studies recognizing the subsidy granted by SIFI status.

The court similarly erred in dismissing the Bank's injury on the ground that it depends on how independent decisionmakers will exercise their judgment.  This Court consistently "allow[s] plaintiffs claiming that regulatory changes have caused competitive injury, defined only as exposure to competition, to sue the

regulating agencies, even though the harm resulted most directly from independent purchasing decisions of third parties," *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308-09 (D.C. Cir. 2001).  It is also irrelevant that, as the district court noted, SIFI designation may in some ways burden designated entities.  A plaintiff injured by government action does not lose standing because that action may also somehow benefit him.  *See, e.g.*, *Markva v. Haveman*, 317 F.3d 547, 557 (6th Cir. 2003).

The district court further erred when it concluded the Bank could not establish traceability because some SIFIs enjoy a cost-of-capital advantage even without designation.  The complaint alleges that (1) SIFI designations will lower costs for entities that previously did not enjoy cost-of-capital advantages, and (2) formal designations will *enhance* any advantage unofficial SIFIs already enjoy.  Both are injuries traceable to the Council's designations.  *Meese v. Keene*, 481 U.S. 465, 476-77 (1987) (recognizing that government designations cause reputational impact); *accord Ams. for Safe Access v. DEA*, 706 F.3d 438, 447 (D.C. Cir. 2013).  Those injuries are actual and ongoing, and the case is ripe for review.

## STANDARD OF REVIEW

This Court reviews *de novo* dismissals for lack of standing, *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1101 (D.C. Cir. 2005), and ripeness, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 461 (D.C. Cir.

2006).  The Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501.  General factual allegations in the complaint are presumed to embrace the specific facts necessary to support the claim, and the Court must draw all reasonable inferences in favor of the nonmoving party.  *Laroque*, 650 F.3d at 785. The Court need identify only one plaintiff with standing for each claim.  *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 175 (D.C. Cir. 2012).

## ARGUMENT

To establish Article III standing, a plaintiff "must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury."  *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).  The Bank has done so here.

## I.  THE DISTRICT COURT ERRED IN HOLDING THAT THE BANK LACKS STANDING TO CHALLENGE THE FORMATION AND OPERATION OF THE BUREAU

The Bureau's authority over and active regulation of consumer financial services has inflicted several injuries on the Bank, each of which confers standing.

### A.  Bureau-Imposed Compliance Costs Confer Standing

The law is clear that plaintiffs are harmed and have standing to bring suit when "they will face even greater compliance costs" as a result of agency action.

22

*Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 458 (D.C. Cir. 2012) (quotations and citation omitted); *see Cellco P'ship v. FCC*, 357 F.3d 88, 100 (D.C. Cir. 2004) ("As an entity continuously burdened by the costs of complying … with what it contends are 'unnecessary' regulations[,] … [plaintiff's] injuries are concrete and actual").  Precedent also establishes that compliance costs include the "increased time and expense necessary … to monitor [agency] activities under new agency regulation," *Spann*, 899 F.2d at 28 (citing *Pac. Legal Found.*, 664 F.2d 1221), and to comply with the demands of an additional regulator, *Ass'n of Am. R.Rs.*, 38 F.3d at 585-86.

1.    *The Bank's Compliance Costs Are an Injury-In-Fact*

The enactment of Title X has forced the Bank to spend tens of thousands of dollars on compliance services to ensure the Bank does not (1) run afoul of any Bureau regulations, which directly govern the Bank's services; or (2) engage in any practice the Bureau might deem unfair, deceptive, or abusive—practices Title X flatly prohibits and authorizes the Bureau to define.  (SAC ¶¶ 75, 95; Purcell Decl. ¶¶ 4-9).

It is well established that such costs constitute an injury-in-fact.  This Court's decision in *Association of American Railroads*, 38 F.3d 582, is instructive. In that case, an association challenged a Federal Railroad Administration rule subjecting railroads to supervision by the Occupational Safety and Health

23

Administration ("OSHA"). *Id.* at 583-84. The government argued the Association lacked standing because it had not suffered injury—the railroads would be subject to similar requirements absent the regulation since OSHA's standards applied by default. *Id.* at 585. The Court nonetheless held the Association had standing, ruling that the Association had "allege[d] sufficient injury-in-fact" by "claim[ing] [that] the necessity of complying with two sets of regulations enforced by two federal agencies compounds the railroads' compliance burden, *regardless of the content of either set of regulations*." *Id*. at 585-86 (emphasis added).

The Court held, in other words, that the burden of "dual regulation" is itself an injury-in-fact. *Id.* at 586 ("additional regulatory burden" of OSHA regulation imposed by new rule conferred standing); *see also Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 402 n.2 (D.C. Cir. 1990) (describing alternative "formulation of the standing test" under which Court asks whether a plaintiff "is directly subject to the governmental authority he seeks to challenge"). The compliance costs that attend direct regulation constitute a real and considerable burden on regulated entities, creating standing to alleviate the same. *Ass'n of Am. R.Rs.*, 38 F.3d at 585-86.

Other courts of appeals agree. In *Liberty University, Inc. v. Lew*, for example, the Fourth Circuit held that, even if the government were correct that the plaintiff already satisfied a challenged law's substantive demands, the "additional

costs [incurred] because of the administrative burden of assuring compliance with" those demands conferred standing.  733 F.3d 72, 90 (4th Cir. 2013).

In *Chambers Medical*, the same court considered whether a company that incinerated waste had standing to challenge a law prohibiting the acceptance of waste from States that forbid incineration within their own borders.  52 F.3d at 1265.  The state defendant argued the company lacked standing because no other State had enacted such a law.  The Fourth Circuit held the company had standing because it alleged it would "incur costs in monitoring the laws of other states so that it may avoid violation of the provision."  *Id*. at 1266.

In *Pacific Legal*, the Fourth Circuit held a plaintiff had standing to challenge a funding program that would increase public access to and participation in FDA rulemaking proceedings.  Under the new rule the plaintiff would need to increase its "vigilance and efforts," including "increased time and expense … monitor[ing]" agency proceedings and proposals.  664 F.2d at 1224; *see also Smith v. Pac. Prop. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (monitoring compliance with law diverts resources, creates standing).

The district court erred in holding to the contrary.  First, the court misunderstood the nature of the costs the Bank is incurring.  They are not simply an expense the Bank "incurs to determine *whether* it needs to satisfy a legal mandate."  (Op. 38-39) (attempting to distinguish *Chambers* on ground that those

25

monitoring costs were "necessarily incurred in order to avoid violating South Carolina law"). The Bank *already knows* that it is subject to the Dodd-Frank Act's prohibition on unfair, deceptive, and abusive practices, as defined by the Bureau, and that its remittance, mortgage servicing, and lending practices are *in fact governed* by Bureau rules. The Bank must satisfy each one of those regulations and ensure it does not engage in any prohibited practice "in order to avoid violating" federal law. (Op. 39).

     The district court also attempted to distinguish the Fourth Circuit's decision in *Pacific Legal* by noting there was "no question" in that case that plaintiffs' activities "would become more expensive under" the new regulation. (*Id*.). But the same is true here: the Bank must monitor and satisfy thousands of pages of Bureau regulations and ensure that it does not engage in any practice the Bureau deems unfair, deceptive, or abusive. That, too, is unquestionably costly.

     Indeed, the Bureau itself has recognized the costs entities must incur to monitor the Bureau's mandates and ensure compliance therewith. In adopting the Ability-to-Repay Rule, the Bureau explained that it had adopted certain "thresholds to maintain consistency with" another Bureau regulation and "emphasized the importance of maintaining consistent criteria … to *minimize* compliance burdens by minimizing the number of metrics creditors must track to determine their eligibility for various regulatory provisions." Revised Ability-to-Repay Rule, 78

Fed. Reg. at 35,485 (emphasis added).  Minimized or not, those compliance

burdens are a cognizable injury-in-fact.  *Ass'n of Private Sector Colls.*, 681 F.3d at

458 (observing, in finding compliance-cost injury, that agency "implicitly

recognized" injury by saying rule would "not impose *significant* burdens or

costs"); *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 454 (D.C. Cir.

2004) (even "threat of relatively small financial injury [is] sufficient to confer

Article III standing" (describing *Franchise Tax Bd. of Ca. v. Alcan Aluminum Ltd*.,

493 U.S. 331 (1990))).

> ### 2.     *The Compliance Costs Are Traceable to Title X and Redressable by the Court*

The district court also erred in concluding that the Bank's compliance costs,

if cognizable, were "self-inflicted" and therefore not traceable to the Bureau.  (Op.

40-41).  As just explained, the Bureau has conceded its regulations impose costs.

As this Court has recognized, moreover, there is a difference between self-inflicted

injures and actions taken in response to defendants' activities.  The central

consideration is whether costs are incurred "in response to, and to counteract the

effects of the defendants'" actions.  *Equal Rights Ctr.*, 633 F.3d at 1140-41.  If so,

the injury is not self-inflicted.  *Id*.  The Bank's compliance costs were a direct

response to the prohibitions and demands of the Dodd-Frank Act and the Bureau's

regulations.  (Purcell Decl. ¶¶ 7-10).  They are not self-inflicted.

Nor does this case bear any resemblance to *Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013), on which the district court relied. (Op. 40-41). The *Clapper* plaintiffs were not themselves regulated by any government policy. They merely speculated the government *might* one day—*if* authorized by an Article III judge—take *non-regulatory* action to monitor communications of *other individuals* in a way that *might* result in interception of their own communications. 133 S. Ct. at 1148, 1152. Under those circumstances, the Court held, the plaintiffs could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 1151, 1153. The Court in *Clapper* specifically distinguished that situation from one in which a plaintiff was "unquestionably regulated by [a] relevant statute" the government had begun to apply. *Id.* at 1153. That is precisely the case here. The Bank is directly regulated by the UDAAP prohibition and Bureau rules. *Clapper* did not involve such regulated entities.

The district court also suggested that the compliance costs were self-inflicted because it was "not clear" to the court that the Bank's compliance services "provide needed information about Bureau regulations that is not readily accessible from the Bureau's" website. (Op. 40-41). That cannot defeat the Bank's standing. First, the district court's description of the compliance services is incorrect. Those services do not parrot the Bureau's website. They analyze the Bureau's activities

28

and regulations and address how they impact institutions like the Bank in particular. (Purcell Decl. ¶ 7). Furthermore, even if the Bank could engage in necessary monitoring by hiring an employee to continually comb the Bureau's website and digest that information for the Bank's purposes, that might well *increase* the Bank's compliance costs. "The possibility of an alternative remedy, of uncertain availability and effect, does not render [an] injury self-inflicted." *Okla. Dep't of Envtl. Quality*, --- F.3d ---, 2014 WL 184624, at *4.

Nor is it any answer to say that "the Bank presumably would still have to spend money to learn about its compliance responsibilities under *other* federal and state regulations" if the Dodd-Frank Act "had never been passed" or were invalidated. (Op. 41). If the Dodd-Frank Act were invalidated, the Bank would no longer need to spend the money it now devotes to Bureau compliance. (Purcell Decl. ¶¶ 7-10, 35-38). The district court's projections of what the Bank's regulatory burdens might look like absent the Bureau cannot negate standing under the current regime. *Free Enter. Fund*, 130 S. Ct. at 3163 n.12 (Court "cannot assume" regulatory action would be same but for constitutional defect; "standing does not require precise proof of what the [agency's] policies might have been in that counterfactual world"); *Ne. Energy Assocs. v. FERC*, 158 F.3d 150, 153-54 (D.C. Cir. 1998) ("possibility" regulation would differ if plaintiff prevailed, "though not a certainty, is sufficient" for redressability).

29

### B.     The Increased Costs of Remittance Transfers and Mortgage Servicing Give the Bank Standing

#### 1.     *The Remittance Rule*

The Bank is also injured financially by the Remittance Rule. As explained above, the Bank could not afford the requirements of the original rule and therefore left the previously profitable remittance market. (SAC ¶ 15). The district court did not dispute that such a loss could constitute an injury-in-fact. It held, however, that the Bank's injury was not cognizable because on the day the Bureau promulgated the original rule, it also stated it was drafting a rule to provide a safe harbor for certain providers. According to the district court, because "it was all but inevitable" the Bank would benefit from a safe harbor, it could not have been injured by the initial rule. (Op. 43).

That logic is flawed. When Private Plaintiffs filed suit, the original rule applied to all transfers, and no entity could rely on the adoption of an exception. *See Frederick Cnty.*, 968 F.2d at 1273 ("[W]hile the Secretary might have been more likely to adopt something like the rule he had proposed, … the growers could not have reasonably relied upon the Secretary's adopting any particular regulation in his final rule decision."); *Int'l Union, United Mine Workers of Am. v. Dep't of Labor*, 358 F.3d 40, 42 (D.C. Cir. 2004) (agency withdrew proposed rule). Nor could any entity be sure an adopted exception would cover them. Here, for example, the safe harbor the Bureau proposed—for providers offering fewer than

30

26 transfers annually—would not have been consistently satisfied by the Bank's historical practices.  (Op. 42).

Even assuming the new rule was "inevitable," the Bank is injured by the costs it must shoulder to ensure it stays within the adopted safe harbor.  The Bureau itself has recognized that businesses bear a real "cost" in "counting remittance transfers (to ensure the conditions of the safe harbor are met)."  Revised Remittance Rule, 77 Fed. Reg. at 50,274-75; *see Ass'n of Private Sector Colls.*, 681 F.3d at 458 (relying on agency description of costs).  The Bank has been forced to assume just that expense, as company policy bars personnel from offering more than ninety-nine transfers annually.  (Purcell Decl. ¶ 18).

The district court nonetheless deemed the Bank's remittance injuries self-inflicted because the Bureau did not actually forbid the Bank from making more transfers, and the Bank "chose[] this route because of its fears of a possible hypothetical harm created by the mere existence of the Bureau's looming regulatory and enforcement powers."  (Op. 56).  That is not correct.  The actions the Bank took—both in exiting the market and in limiting transfers—were not the result of the Bureau's "mere existence," but a direct response to specific regulation.  Those injuries are not self-inflicted.  *Equal Rights Ctr.*, 633 F.3d at 1140-41.  Nor are they speculative: they have already occurred.  The Bank therefore has standing, and its challenge to the constitutionality of Title X is ripe

31

for review. *See Ass'n of Am. R.Rs.*, 721 F.3d at 672 n.6 (issue of statute's constitutionality is "purely legal question" "appropriate for immediate judicial resolution" even prior to agency enforcement of standards promulgated under statute).

### 2.    *The Foreclosure Rule*

The Bank is also subject to and injured by the Foreclosure Rule, which prohibits the Bank from using a Texas procedure that prompts borrowers to quickly become current on delinquent loans, thereby increasing the Bank's costs of doing business and deterring the Bank from issuing new mortgages.  (Purcell Decl. ¶¶ 36-38; Second Purcell Decl. ¶ 12; SAC ¶¶ 83, 95-96).  Such injuries plainly suffice for standing.  *Chamber of Commerce*, 443 F.3d at 896-97 (standing to challenge rule that "present[ed] barriers to entry" for companies in which plaintiff wanted to invest); *Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards*, 128 F.3d 910, 916 (5th Cir. 1997) ("increased costs of doing business imposed on contractors by [applicable] Rule" were actionable injury); *Ill. State Chamber of Commerce v. EPA*, 775 F.2d 1141, 1142 n.2 (7th Cir. 1985) (standing where government action "threaten[ed] an increase in the cost of doing business").

The district court nonetheless held the Bank lacked standing because (1) the Bank allegedly failed to plead the injury and (2) the record supposedly did not confirm the costs of the Rule.  That is incorrect.

32

*First*, the Bank more than adequately alleged harm from the Foreclosure Rule. The Second Amended Complaint explicitly alleges ongoing injury from the Bureau's regulation of the mortgage market, describes the "substantially increased compliance costs" imposed by Bureau regulations, and states that the costs of those regulations and threat of Bureau enforcement authority are a continuing barrier to the Bank reentering the market. (SAC ¶¶ 77-78, 94-96; Purcell Decl. ¶¶ 37-38). The complaint even cites Regulation X, of which the Foreclosure Rule is a part. (SAC ¶ 96).

That the precise impact of the Foreclosure Rule is not delineated in the Complaint—though it is in the Bank's affidavits and briefing—does not render the injury beyond judicial cognizance. It is well established that general factual allegations (like the allegation that Bureau regulations are keeping the Bank out of the market) are presumed to include specific facts necessary to a claim (like the specific regulations doing so). *Laroque*, 650 F.3d at 785. Plaintiffs are not required to include legal citations in their complaints. *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) (plaintiffs not required to plead "precise legal theory" or provide "exposition of [their] legal argument"). And it is black-letter law that "[t]his court and the district court may properly consider affidavits submitted by the parties, in addition to the complaint, to resolve the standing question." *Spann*, 899 F.2d at 28 n.1.

33

The court similarly erred in concluding the Bank did not plead with sufficient specificity that it serviced mortgages covered by the rule. The whole gravamen of plaintiffs' claim is that the Bank has been *injured* because it can *no longer use* its prior Texas practice. Fairly read, that allegation necessarily reflects that (1) the Bank wants to continue using that practice (which it alleged was a useful tool to prompt borrowers to make payments); and (2) the Bank's mortgages are covered by the rule.

The district court also erred in relying on evidence proffered by the government to conclude it was "speculative" whether the regulation would impose any costs, reasoning that the Bank has a small mortgage portfolio and has not recently had defaults on its loans. (Op. 47). At the motion-to-dismiss stage, the Bank "is protected from an evidentiary attack on [its] asserted theory by the defendant." *Haase v. Sessions*, 835 F.2d 902, 907, 908 (D.C. Cir. 1987).

The government's evidence does not in any event defeat the Bank's standing. That the Bank's loans have not recently been in default does not mean they will continue to remain current. Moreover, the Bank must make its present business plans knowing it cannot use the Texas procedure in the future. The increased foreclosure costs and delay imposed by the rule thus present barriers to reentering the mortgage market, as the Bank has averred. (Purcell Decl. ¶ 36; Second Purcell Decl. ¶ 12); *see Settles*, 429 F.3d at 1107 ("factual resolution of

34

[plaintiff's] allegations and a rejection of his theory of the case based on evidence submitted by the Commission … exceeded the bounds of factual inquiry … appropriate on review of a Rule 12(b)(1) motion").

The Bureau's rule prohibits a practice the Bank has used and wishes to continue using. This both increases the costs for servicing mortgages already under contract and prevents the Bank from reentering the market. That is sufficient for standing. *Idaho Power Co.*, 312 F.3d at 459-61 (it is "inconceivable that [a party] could be subjected to [an agency] order" dictating the use of its property "but lack standing to challenge that order"—even if the government deems the party "unlikely to suffer any economic loss [from the order] in the future").

### C.     The Bank's Lost Profits in the Mortgage Market Provide Standing

Before the Bureau was created, the Bank maintained a profitable consumer-mortgage business. The creation and operation of the Bureau—including the Foreclosure, Ability-to-Repay, and Escrow Rules—has significantly increased the costs and risks associated with that business. The Bureau has taken enforcement actions against other mortgage providers. *CFPB v. Castle & Cooke Mortg.*, No. 13-0684 (D. Utah). And although the Bureau has the sole authority to define unfair, deceptive, and abusive practices, it has refused to do so, leaving the Bank to guess at what sorts of activities may subject it to significant daily fines. (SAC

35

¶¶ 16, 72-78).[2]  That is an expensive risk the Bank has reasonably determined it

cannot afford to take.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528

U.S. 167, 181-85 (2000) (standing where plaintiffs ceased activities near allegedly

illegal discharges for fear they would be harmed by pollution, because plaintiffs

had "reasonable concerns about the effects of" challenged discharges and had been

injured as a result).  As the Bank explained below, "[b]ut for the Bureau, its rules,

and its enforcement authority, the Bank would reenter the consumer mortgage

market" without limitation.  (Purcell Decl. ¶ 38).  That, too, is injury enough to

sue.  Although the district court suggested several grounds for discounting the

Bank's mortgage-market injury, none has merit.

        1.    *The Escrow Rule*

    The district court failed to address the Escrow Rule, even though Private

Plaintiffs described its burden in court-ordered supplemental briefing.  (Private

---

[2] That the Office of the Comptroller of the Currency is the Bank's prudential regulator does not detract from the Bureau's jurisdiction over the mortgage industry and unfair, deceptive, and abusive acts and practices.  As the district court recognized, the Bureau will "undoubtedly" exert "significant influence over the OCC's interpretation and enforcement of the statute," either through its own enforcement actions or by recommending enforcement to the OCC—a recommendation to which the OCC is required by law to respond.  (Op. 57); 12 U.S.C. §§ 5516(d)(2)(A) & (B), 5531(a); *see Bennett v. Spear*, 520 U.S. 154, 168-69 (1997); *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5, 6 (D.C. Cir. 2005).  Lest there be any doubt about the Bureau's complete authority in this regard, the government itself describes the Bureau as the "single authority with accountability to *ensure* that Federal consumer financial law is comprehensive, fair, and vigorously enforced."  (Mot. to Dismiss 6) (emphasis added).

Pls.' Supp. Br. at 3 (Doc. 38)).  That itself warrants reversal.  *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 419-20 (D.C. Cir. 1991) (reversing and remanding when "trial court completely failed to address two additional, and distinct, theories of the case").  But no remand on the question is necessary:  the increased costs imposed by that rule—which would require the Bank to purchase software necessary to establish and hold an escrow account with sufficient funds to pay property taxes and insurance for covered mortgages—plainly present a "barrier to entry" that provides standing.  *Chamber of Commerce*, 443 F.3d at 896-97; *see* Escrow Rule, 78 Fed. Reg. at 4,735 (Bureau's acknowledgment that "the number of providers" of higher-priced mortgage loans "could be further reduced" given the "additional costs associated with establishing and maintaining escrow accounts").

> 2.    *The Ability-to-Repay Rule*

The court determined it could not consider harm caused by the Ability-to-Repay Rule because it "did not exist" when the original complaint was filed.  (Op. 48).  The rule was promulgated before the *operative* complaint was filed, however, and that complaint (along with affidavits and briefing) explicitly alleges ongoing injury from the Bureau's regulation of the mortgage market.  (SAC ¶¶ 78-79, 95-96) (citing Regulation Z, of which Ability-to-Repay Rule is part); *see Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1495 (D.C. Cir. 1996) ("supplemental allegations in the amended complaint suffice to establish the appellant's standing").

Next, the court thought it "sheer conjecture" whether the Ability-to-Repay Rule would be invoked and therefore deemed implausible the Bank's allegation that the rule "impose[s] an additional risk factor that would affect the costs and structure" of its mortgage loans.  (Op. 50).  The Bureau, however, has taken the opposite position.  It has recognized that small creditors "may find even a remote prospect of [individual] litigation risk to be so daunting that they may change their business models to avoid it" and may "be less likely to make such loans due to concerns about liability risk."  Revised Ability-to-Repay Rule, 78 Fed. Reg. at 35,478-79; *accord Rio Grande*, 178 F.3d at 540 (agency decision leaving rates open to future litigation affected company's "present economic behavior"); *Great Lakes*, 984 F.2d at 430-31 (future risk caused by agency decision created "present injurious effect on [petitioner's] business decisions"); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 164 (3d Cir. 2001) (recognizing in class-action context that small risk of major liability can create "inordinate or hydraulic pressure" on business to settle case).  There is nothing implausible about the allegation that the Bureau's rule will affect the costs and structure of a lender's loans.

The district court also concluded "the Bank's claim of injury based on" the Ability-to-Repay Rule "faces a redressability problem" because "[e]ven if the Court were to invalidate Title X," rulemaking authority "could revert to the Federal

Reserve Board," which the court apparently believed would issue a similar rule. (Op. 50). As explained above, however, that type of prognostication is foreclosed by the Supreme Court's decision in *Free Enterprise Fund*, 130 S. Ct. at 3163 n.12; *supra* 29.

The district court also believed uncertainty regarding the Ability-to-Repay Rule rendered the suit unripe. (Op. 51-52). But Private Plaintiffs raise a facial constitutional challenge to Title X, not the rule. Even assuming the rule is "in progress," therefore, the facial challenge to the statute remains purely legal and therefore "presumptively reviewable." *Nat'l Ass'n of Home Builders*, 417 F.3d at 1282; *see Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 715 (D.C. Cir. 2011). No further factual development will help the court determine if the statute is constitutional. *See Ass'n of Am. R.Rs.*, 721 F.3d at 672 n.6.

In addition, the Revised Ability-to-Repay Rule has *already* had a concrete effect on the Bank's business practices, preventing it from reentering the mortgage market. *Cf. Cablevision*, 649 F.3d at 716 (agency rule that "create[s] an incentive for petitioners to alter their business affairs[] establish[es] at least some degree of hardship"). It does not matter that the rule may undergo some further (as of yet unannounced and undefined) amendment. *Nat'l Ass'n of Home Builders*, 417 F.3d at 1282 ("[T]hat a law may be altered in the future has nothing to do with whether

it is subject to judicial review at the moment.").  The Bank has already been injured, and the suit is ripe.

### 3.    *The "UDAAP" Authority*

The court also made multiple errors in rejecting the Bank's claim that the Bureau's UDAAP authority caused it to exit and prevents it from reentering the consumer mortgage market.

a.  First, noting that the Bank left the market before the Bureau issued its mortgage regulations, the court concluded that "one can only infer that the Bank's generalized fear (or dislike) of the law, and not the mere possibility of increased costs associated with the rules governing mortgages, provides the primary motivation for the Bank to stay out of this business."  (Op. 55).  That conclusion is squarely at odds with the rule that the court must draw all reasonable inferences in favor of the nonmoving party, *Laroque*, 650 F.3d at 785; the Bank clearly detailed the specific concerns that prompted it to leave the mortgage market, and they were not a "generalized fear (or dislike)" of Title X.  (Purcell Decl. ¶¶ 23-30).  What is more, the district court ignored that the operative complaint pleads injury from the ongoing decision *not to reenter* the mortgage market, a continuing injury that post-dates the Bureau's regulations and exercise of enforcement authority.  (SAC ¶¶ 94-96).

40

b.  Next, the district court deemed the Bank's exit from the mortgage market a "self-inflicted injury."  (Op. 56).  But the Supreme Court in *Clapper* recently reaffirmed plaintiffs' "standing based on a 'substantial risk' that [a] harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm."  133 S. Ct. at 1150 n.5.  Indeed, the Supreme Court has recognized that the threat of adverse government action, even if unexercised, "undoubtedly influence[s]" regulated activity and renders injuries from that activity "fairly traceable" to the government.  *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264-65 & n.13 (1991) (standing and ripeness satisfied because "[t]he threat of the veto hangs over the Board of Directors like the sword over Damocles, creating a here-and-now subservience … sufficient to raise constitutional questions").  To hold to the contrary would effectively bar all pre-enforcement challenges and force regulated entities to violate the law before they have standing to bring suit.  That is not the law.  *See Ass'n of Am. R.Rs.*, 721 F.3d at 672 & n.6 (rejecting argument that case was nonjusticiable because allegedly injurious standards "themselves impose[d] no liability" but would have to be enforced by agency).

As the district court recognized, moreover, this Court has held that plaintiffs suffer a cognizable injury from "agency action that causes a plaintiff to be exposed to additional risks, which in turn affect the plaintiff's business decisions."  (Op.

41

60); *see Rio Grande*, 178 F.3d at 540 (standing to challenge agency decision not to approve rates under provision that would immunize them from third-party challenge, even though no challenge was imminent, because uncertainty created by potential for litigation "affect[ed] both [the company's] present economic behavior—investment plans and creditworthiness—and its future business relationships"); *Great Lakes*, 984 F.2d at 430-31 (standing although agency's order would cause injury only if third party failed to take a particular action in future, because future risk created "present injurious effect on [petitioner's] business decisions and competitive posture within the industry"); *see also United States v. Storer Broad. Co.*, 351 U.S. 192, 199-200 (1956) (standing when challenged rules prevent plaintiff from "cogently plan[ning] its present or future operations" and "control[ling] [its] business affairs").  To hold otherwise "would ignore the reality of the long-range economic planning involved in the sound management of an enterprise." *Great Lakes*, 984 F.2d at 430-31.

The district court attempted to distinguish that circuit precedent on the grounds that it involved situations where "the agency *did something* that caused the plaintiff injury" and had "a demonstrated *concrete* impact" on plaintiffs' economic behavior.  (Op. 60).  But that is exactly what has happened here: the Bureau has promulgated rules and exercised enforcement authority that increase the costs and

risks of offering consumer mortgages, preventing the Bank from reentering a previously profitable market it would rejoin but for the Bureau.

c.  This Court has also held that a company has standing to challenge a law, even if the law has not been enforced, if it is "reasonably certain" the company's "business decisions will be affected" by the challenged provision.  *Sabre, Inc. v. DOT*, 429 F.3d 1113, 1119 (D.C. Cir. 2005); *see Constellation Energy Commodities Grp., Inc. v. FERC*, 457 F.3d 14, 20 (D.C. Cir. 2006); *Seegars v. Gonzales*, 396 F.3d 1248, 1253 (D.C. Cir. 2005).  In *Sabre*, this Court held a plaintiff had standing to challenge an agency regulation even though "no regulations promulgated by the Department [of Transportation] … constrain[ed] [the plaintiff's] business activity and no relevant enforcement actions [we]re pending" because the Department: (1) claimed jurisdiction over the industry; (2) made "statements indicat[ing] a very high probability" it would "act against a practice [the plaintiff] would otherwise find financially attractive," and (3) had the authority to impose "civil penalties … without prior warning by rulemaking or [a] cease-and-desist order."  429 F.3d at 1115.

Here, of course, the law has *already* been enforced; the Bureau *has* promulgated regulations constraining the Bank's business activity and asserted enforcement authority over the consumer mortgage market.  But the *Sabre* criteria are also met:  the Bureau has claimed jurisdiction over the industry; the Bureau's

43

"statements indicate[] a very high probability" that the agency will act against the higher-priced mortgages the Bank previously found profitable, and the Bank may be subject to daily "civil penalties … without prior warning by rulemaking or [a] cease-and-desist order."  429 F.3d at 1115; *see* (SAC ¶¶ 83, 91) (Mr. Cordray's statement that "complaints about … mortgages," including "the origination of high-priced mortgages," will be an enforcement priority); 12 U.S.C. § 5565(c)(1)-(c)(2) (describing penalties).

The district court concluded there was nonetheless no probability the Bureau would "use its UDAAP authority to take action against the Bank."  (Op. 57).  But *Sabre* requires only a high probability of action against *high-priced mortgages*, a product the Bank would otherwise find attractive.  *Sabre*, 429 F.3d at 1115; *see also Columbia Broad. Sys. v. United States*, 316 U.S. 407, 417-18 (1942) ("It is enough that failure to comply with [the regulations] penalizes licensees" even if "it is not certain whether the [agency] will institute proceedings to enforce the penalty incurred under its regulations for non-compliance.").  The government's statements targeting mortgages are unequivocal.  And but for that threat of enforcement (and the additional costs of Bureau regulations), the Bank would reenter the market. That is an injury-in-fact, traceable to the Bureau, and redressable by this Court.

44

## II. CONTRARY TO THE DISTRICT COURT'S DECISION, THE BANK HAS STANDING TO CHALLENGE MR. CORDRAY'S UNCONSTITUTIONAL "RECESS" APPOINTMENT

The district court's conclusion that the Bank lacks standing to challenge Mr. Cordray's "recess" appointment is based on its conclusion that the Bank lacked standing to challenge the Bureau. (Op. 35-36, 61). For the reasons described above, that conclusion was in error. Indeed, the Bureau took several actions under Mr. Cordray's pre-confirmation leadership that injure the Bank, including the Remittance, Foreclosure, Ability-to-Repay, and Escrow Rules. Those injuries are traceable to the unconstitutional "recess" appointment and redressable by this Court. *Free Enter. Fund*, 130 S. Ct. at 3163 n.12 (standing to challenge allegedly unconstitutional appointments by committee because Court "cannot assume[] … the Chairman would have made the same appointments acting alone"); *Nguyen*, 539 U.S. at 77-83 (vacating conviction where appellate panel included unconstitutional judge).[3]

---

[3] Post-confirmation, Director Cordray purported to "affirm and ratify" all actions taken during his "recess" appointment. *Notice of Ratification*, 78 Fed. Reg. 53,734, 53,734 (Aug. 30, 2013). But his decree does not retroactively make the Bureau's rules lawful. Given the significant backlash to those rules, (Op. 51-52), it is by no means clear that the Bureau could or would pass them after notice-and-comment rulemaking today, as required for ratification. *FEC v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994) (it is "essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, but also at the time the ratification was made"); *cf. FEC v. Legi-Tech, Inc.*, 75 F.3d 704, 708 (D.C. Cir. 1996) (permitting ratification where it was "virtually inconceivable that [agency's] decisions would differ in any way the second time").

## III.    THE DISTRICT COURT WRONGLY HELD THE BANK LACKS STANDING TO CHALLENGE THE FORMATION AND OPERATION OF THE COUNCIL

### A.    SIFI Designations Injure the Bank

This Court has repeatedly held that a plaintiff has standing when it "face[s] intensified competition" as a result of agency action affecting a relevant market. *Shays*, 414 F.3d at 86; *see Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (collecting cases).  The showing required to establish competitor standing is not onerous.  As the district court at one point recognized, a plaintiff need only "*allege* that it is 'a direct and current competitor whose bottom line *may be* adversely affected by the challenged government action.'"  (Op. 11) (emphases added and omitted) (quoting *New World Radio, Inc. v. FCC*, 294 F.3d 164, 170 (D.C. Cir. 2002)).

Private Plaintiffs have alleged that the Bank competes with GE Capital in the consumer loan and capital acquisition/deposit markets.  (Second Purcell Decl. ¶¶ 6, 11, 13, 17); *see* (SAC ¶¶ 143-49) (alleging injury from SIFI designations that were then imminent).  They have further alleged that GE Capital receives a reputational subsidy as a result of its SIFI designation, which allows GE Capital to raise money at lower costs than it otherwise could, negatively impacting the Bank's ability to compete for the same finite funds.  (SAC ¶¶ 143-44, 149).  That constitutes an injury-in-fact under this Court's precedent.  *See*, *e.g.*, *Exxon Co.*

46

*USA v. FERC*, 182 F.3d 30, 43 (D.C. Cir. 1999) (standing to challenge government treatment of pipeline used by competitor because government allegedly "overvalued" the petroleum and thereby created subsidy for competitor); *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (standing if entity is "ready, willing, and able to compete" but "subsidy prevents them from doing so on an equal basis").

Although the district court attributed "some plausibility" to the allegation that GE Capital is the Bank's competitor, it concluded that the Bank lacked standing because: (1) the Bank failed to make a "concrete showing" of competitive injury; (2) the Bank's theory of standing "require[d] guesswork as to how independent decisionmakers will exercise their judgment"; and (3) the advantages of SIFI designation might be outweighed by regulatory burdens. (Op. 12-14). None of those conclusions has merit.

1. The district court was doubly mistaken in holding that the Bank lacked standing because it had not made a "*concrete showing*" of competitive harm caused by SIFI designation. (Op. 11, 14) (emphasis in original); *see* (Motion to Dismiss Hearing Tr. 78) (asking for "historical[]" "proof" that SIFIs receive cost-of-capital subsidy). First, requiring a "concrete showing" of harm cannot be squared with the pleading requirements on a motion to dismiss, when a plaintiff "need not plead all the facts sufficient to prove his allegations" or offer "evidence

that will ultimately be used at trial." *In re Sealed Case*, 494 F.3d at 147-48. The

cases on which the district court relied to demand such a showing arose on

petitions for review of final agency decisions, not motions to dismiss. *KERM, Inc.*

*v. FCC*, 353 F.3d 57, 60-61 (D.C. Cir. 2004); *New World Radio*, 294 F.3d at 170.

Even if the district court were correct in requiring such a showing, it was

wrong in concluding it had not been made. The Bank provided the court with

several reports detailing the SIFI subsidy effect, and the academic support is

legion.[4] There can be no doubt—and at the very least no doubt sufficient to render

implausible the Bank's allegation—that Council designations subsidize SIFIs and

reduce their borrowing costs vis-à-vis competitors.

The district court also found it "difficult to understand" how the Bank and

GE Capital could be competitors given that they offer different interest rates. (Op.

---

[4] (Jacob Decl. Ex. 1 at 2) (collecting empirical sources); *see also* Maziar
Peihani, *Systemically Important Financial Institutions (SIFIs): An Analysis of
Current Regulatory Developments*, 29 Banking & Fin. L. Rev. 129, 133 (2013)
("Since SIFIs enjoy an implicit guarantee of their liabilities, they can raise capital
at a lower cost."); David Skeel, The New Financial Deal: Understanding the Dodd-
Frank Act and Its (Unintended) Consequences 9 (2011) (Because "no one really
believes the largest [SIFIs] will be allowed to fail, they will have a competitive
advantage over other financial institutions."); Pierre-Hugues Verdier, *The Political
Economy of International Financial Regulation*, 88 Ind. L.J. 1405, 1460 & n.310
(2013); M. Patrick Yingling, *Conventional and Unconventional Corruption*, 51
Duq. L. Rev. 263, 287 (2013); Nizan Geslevich Packin, *It's (Not) All About the
Money: Using Behavioral Economics to Improve Regulation of Risk Management
in Financial Institutions*, 15 U. Pa. J. Bus. L. 419, 428 (2013); Peter Conti-Brown,
*Elective Shareholder Liability*, 64 Stan L. Rev. 409, 422-23 (2012).

13 n.8).  But interest rates are only one factor consumers weigh in determining

where to invest.  Other considerations include, for example, the convenience of

working with a particular institution and the risks associated with an investment.

In this case, GE Capital's higher interest rate reflects the fact that it is not backed

by the FDIC.  *Cf. Riggs Nat'l Corp. & Subsidiaries v. Comm'r of Internal Revenue

Serv.*, 163 F.3d 1363, 1369 (D.C. Cir. 1999) (suggesting borrower is charged less

interest when he assumes lender's risks).  The district court erred in failing to

accept as true the plausible facts alleged by plaintiffs—including that the Bank and

GE Capital compete in the consumer loan (particularly agricultural) and consumer

deposit account markets.  *Laroque*, 650 F.3d at 785.  Furthermore, a plaintiff need

not show that its product is identical to that of a competitor to establish

competition—or standing.  *See Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 13 (D.C.

Cir. 2006) (enough for competitor standing that entities competed "in some minor

way" and in "some of the same markets").  The differing interest rates do not

detract from the reality that the Bank and GE Capital both (1) offer deposit

accounts, (2) intended for the same fungible capital, (3) in the same geographic

market.

    2.  The district court further rejected the Bank's competitive injury as

depending on "guesswork as to how independent decisionmakers [customers] will

exercise their judgment"—so-called "speculat[ion] that the designation will cause

49

investors to flock to the designees because they will be perceived as safer investments." (Op. 13). This Court, however, has consistently "allowed plaintiffs claiming that regulatory changes have caused competitive injury, defined only as exposure to competition, to sue the regulating agencies, even though the harm resulted most directly from independent purchasing decisions of third parties." *Tozzi*, 271 F.3d at 308-09 (quotations omitted). The district court's contrary "reasoning is inconsistent with the competitor standing doctrine." *Bristol-Myers Squibb*, 91 F.3d at 1499.

The Bank's alleged harms, moreover, are not like those in *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721 (2013). (Op. 11, 14). In that case, it was "absolutely clear" Nike could not harm Already with further trademark litigation, the alleged source of competitive injury. 133 S. Ct. at 730-31. Here, in contrast, the Council has named—and is poised to continue naming—SIFIs, subsidizing more and more of the Bank's competitors.

3. It is irrelevant that, as the district court noted (Op. 13-14), SIFI designation may also burden designated entities. A plaintiff injured by government action does not lose standing because that action may also benefit him in some other way. *Markva*, 317 F.3d at 557 (rejecting netting of costs and benefits simultaneously imposed by state regulation for purposes of assessing injury to Medicaid recipients); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1175

50

n.2 (D.C. Cir. 1978) (for antitrust standing, "'offsetting benefits' … are utterly

irrelevant to a determination of 'injury-in-fact' at the Standing stage").

### B.     The Bank's Injuries Are Fairly Traceable to the Council's Designations and Ripe for Review

The district court further erred when it concluded the Bank could not

establish a causal connection between the Council's designations and the SIFI

subsidy, reasoning that many institutions "already enjoy a cost-of-capital

advantage, even without a formal SIFI designation."  (Op. 15) (citing GE Capital's

higher interest rates).

The complaint alleges, however, that (1) SIFI designations will lower

borrowing costs for entities that previously did not enjoy cost-of-capital

advantages, and (2) formal designations will *enhance* any cost-of-capital advantage

unofficial SIFIs already enjoy.  (SAC ¶ 148).  Both injuries are directly traceable to

the Council's designation.  *See Meese*, 481 U.S. at 476-77 (recognizing that formal

government designations cause meaningful reputational impact); *Ams. for Safe

Access*, 706 F.3d at 447 (government classification "announce[d] an authoritative

value judgment" that "surely was meant to" affect third parties); *Tozzi*, 271 F.3d at

309 (government labels can cause "the probability of economic harm [to]

increase[] exponentially"; "we have never applied a 'tort' standard of causation to

the question of traceability.").

Redressability—which need only be "likely as opposed to merely speculative," *Friends of the Earth*, 528 U.S. at 187—is also easily satisfied. Enjoining the Council's designation authority and vacating past designations would redress the Bank's economic injuries attributable to competition with formally-designated entities. *U.S. Telecom*, 295 F.3d at 1331.

The court held the Bank's challenge to Title I was not ripe for the same reasons it concluded the Bank lacked standing. (Op. 15-16). As explained, the district court was mistaken. The Bank's injury from SIFI designations is actual and ongoing, and the case is ripe for review.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed.

Dated:  February 11, 2014                    Respectfully submitted,


                                             /s/ Gregory F. Jacob
                                             Gregory F. Jacob
                                             O'MELVENY & MYERS LLP
                                             1625 Eye Street NW
                                             Washington, D.C. 20006
                                             Telephone: (202) 383-5300

                                             C. Boyden Gray
                                             Adam J. White
                                             Adam R.F. Gustafson
                                             BOYDEN GRAY & ASSOCIATES P.L.L.C.
                                             1627 Eye Street NW, Suite 950
                                             Washington, D.C. 20006
                                             Telephone: (202) 955-0620

                                             *Counsel for Plaintiffs-Appellants State
                                             National Bank of Big Spring, the 60 Plus
                                             Association, Inc., and Competitive
                                             Enterprise Institute*

                                             Sam Kazman
                                             Hans Bader
                                             COMPETITIVE ENTERPRISE INSTITUTE
                                             1899 L Street NW, Floor 12
                                             Washington, D.C. 20036
                                             Telephone: (202) 331-1010

                                             *Co-Counsel for Plaintiff-Appellant
                                             Competitive Enterprise Institute*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and the Order of this Court dated December 20, 2013 (Doc. No. 1471629), because this brief contains 11,839 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(1).

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionately spaced typeface using the 2010 version of Microsoft Word in fourteen-point Times New Roman font.

/s/ Gregory F. Jacob
Gregory F. Jacob
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, D.C. 20006
Telephone: (202) 383-5300

## **CERTIFICATE OF SERVICE**

I certify that on this 11th day of February 2014, I filed the foregoing brief

with the Court in hard copy and electronically.  I further certify that on this 11th

day of February 2014, I served the foregoing brief on all counsel of record through

the Court's CM/ECF system.


/s/ Gregory F. Jacob
Gregory F. Jacob
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, D.C. 20006
Telephone: (202) 383-5300