ORAL ARGUMENT NOT YET SCHEDULED

**Nos. 13-5247 & 13-5248**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**STATE NATIONAL BANK OF BIG SPRING, et al.,**

**and**

**STATES OF SOUTH CAROLINA, et al.,**

*Appellants*,

**v.**

**JACOB J. LEW, et al.,**

*Appellees.*

_____

On Appeal from the United States District Court for the District of Columbia
No. 1:12-cv-001032-ESH

_____

**OPENING BRIEF FOR THE STATE APPELLANTS**

_____

Alan Wilson
*Attorney General of South Carolina*
James Emory Smith, Jr.
Rembert Dennis Building
1000 Assembly Street, Room 519
Columbia, SC 29201
agalanwilson@scag.gov
(803) 734-3970

*Counsel for the State of South Carolina*

E. Scott Pruitt
*Attorney General of Oklahoma*
Patrick R. Wyrick
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
scott.pruitt@oag.ok.gov
(405) 521.3921

*Counsel for the State of Oklahoma*

(Additional Counsel Listed Inside)

Luther Strange
*Attorney General of Alabama*
Andrew L. Brasher
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36104
(334) 242-7300

*Counsel for the State of Alabama*

Samuel S. Olens
*Attorney General of Georgia*
John E. Hennelly
Georgia Department of Law
40 Capitol Square SW
Atlanta, GA 30334-1300
(404) 656-3300

*Counsel for the State of Georgia*

Derek Schmidt
*Attorney General of Kansas*
Jeffrey A. Chanay
Office of the Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612
(785) 296-2215

*Counsel for the State of Kansas*

Bill Schuette
*Attorney General of Michigan*
G. Mennen Williams Building, 7th Fl.
525 W. Ottawa St.
P.O. Box 30212
Lansing, MI 48909
miag@michigan.gov
(517) 373-1110

*Counsel for Bill Schuette, Attorney General of the State of Michigan, on Behalf of the People of Michigan*

Timothy C. Fox
*Attorney General of Montana*
Lawrence VanDyke
Timothy C. Fox
Office of the Attorney General
Department of Justice
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026

*Counsel for the State of Montana*

Jon Bruning
*Attorney General of Nebraska*
Katherine J. Spohn
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683

*Counsel for the State of Nebraska*

Michael DeWine
*Attorney General of Ohio*
Jennifer L. Pratt
Office of the Attorney General
30 E. Broad St., 14th Floor
Columbus, OH 43215
(614) 728-4948

*Counsel for the State of Ohio*

Greg Abbott
*Attorney General of Texas*
John Reed Clay, Jr.
Office of the Attorney General
300 W. 15th Street
Austin, TX 78701
(512) 936-1342

*Counsel for the State of Texas*

Patrick Morrisey
*Attorney General of West Virginia*
Elbert Lin
State Capitol Complex
Building 1 Room 26-E
Charleston, WV 25305
(304) 558-2021

*Counsel for the State of West Virginia*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### <u>Parties</u>

1.     The Private Plaintiffs-Appellants in this action are:

    a.     State National Bank of Big Spring;

    b.     The 60 Plus Association; and

    c.     The Competitive Enterprise Institute.

2.     The State Plaintiffs-Appellants in this action are:

    a.     The State of Alabama;

    b.     The State of Georgia;

    c.     The State of Kansas;

    d.     The State of Montana;

    e.     The State of Nebraska;

    f.     The State of Ohio;

    g.     The State of Oklahoma;

    h.     The State of South Carolina;

    i.     The State of Texas;

    j.     The State of West Virginia; and

k.     Michigan Attorney General Bill Schuette on behalf of the People of Michigan.

3.     The Defendants-Appellees in this action are:

a.     Jacob J. Lew, in his official capacities as Secretary of the Treasury and *ex officio* Chairman of the Financial Stability Oversight Council;

b.     The United States Department of the Treasury;

c.     Richard Cordray, in his official capacities as (1) Director of the Consumer Financial Protection Bureau, (2) *ex officio* Director of the Federal Deposit Insurance Corporation, and (3) *ex officio* member of the Financial Stability Oversight Council;

d.     The Consumer Financial Protection Bureau;

e.     Janet Yellen, in her official capacities as Chairman of the Board of Governors of the Federal Reserve System and *ex officio* Member of the Financial Stability Oversight Council;

f.     Janet Yellen, in her official capacity as Vice Chairman of the Board of Governors of the Federal Reserve System, a position now vacant;

g.    Elizabeth Duke, in her official capacity as member of the Board of Governors of the Federal Reserve System, a position now vacant;

h.    Jerome H. Powell, in his official capacity as member of the Board of Governors of the Federal Reserve System, a position now vacant;

i.    Sarah Bloom Raskin, in her official capacity as member of the Board of Governors of the Federal Reserve System;

j.    Jeremy C. Stein, in his official capacity as member of the Board of Governors of the Federal Reserve System;

k.    Daniel K. Tarullo, in his official capacity as member of the Board of Governors of the Federal Reserve System;

l.    The Board of Governors of the Federal Reserve System;

m.    Martin J. Gruenberg, in his official capacities as Chairman of the Board of Directors of the Federal Deposit Insurance Corporation and *ex officio* Member of the Financial Stability Oversight Council;

n.    Thomas M. Hoenig, in his official capacity as Vice Chairman of the Federal Deposit Insurance Corporation;

o.    Jeremiah Norton, in his official capacity as Director of the Federal Deposit Insurance Corporation;

p.    Thomas J. Curry, in his official capacities as (1) U.S. Comptroller of the Currency, (2) *ex officio* Director of the Federal Deposit Insurance Corporation, and (3) *ex officio* member of the Financial Stability Oversight Council;

q.    The Federal Deposit Insurance Corporation;

r.    Mary Jo White, in her official capacities as Chairman of the U.S. Securities and Exchange Commission and *ex officio* member of the Financial Oversight Council;

s.    Mark P. Wetjen, in his official capacities as Acting Chairman of the U.S. Commodity Futures Trading Commission and *ex officio* member of the Financial Stability Oversight Council;

t.    Debbie Matz, in her official capacities as Chairman of the National Credit Union Administration Board and ex officio Member of the Financial Stability Oversight Council;

u.    S. Roy Woodall, in his official capacity as Member of the Financial Stability Oversight Council;

iv

v.    The Financial Stability Oversight Council.

**Rulings Under Review**

Appellants appeal the August 1, 2013, Order of the District Court for the District of Columbia (Honorable Ellen S. Huvelle) granting defendants' motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See* 2013 WL 3945027; 2013 U.S. Dist. LEXIS 108308.

**Related Cases**

This appeal pertains not to the merits of the Plaintiffs' substantive constitutional claims against Defendants, but rather their standing to bring those claims, and the ripeness of those claims. This case has not previously been before this Court.

In *Morgan Drexen, Inc. v. CFPB*, No. 13-5342 (D.C. Cir.), different plaintiffs have challenged the constitutionality of the Consumer Financial Protection Bureau, as Private Plaintiffs do in Count I of the Second Amended Complaint.  Similar constitutional claims are raised in *CFPB v. Morgan Drexen, Inc.*, No. 13-01267 (C.D. Cal.).

In *Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013), this Court held that certain Executive Branch "recess" appointments made on January 4,

2012, were invalid, as Private Plaintiffs allege in Count II of their Second Amended

Complaint.  Similar holdings were reached by the Third Circuit in *NLRB v. New*

*Vista Nursing & Rehabilitation*, 719 F.3d 203 (3d Cir. 2013), and by the Fourth

Circuit in *NLRB v. Enter. Leasing Co. Southeast, LLC*, 722 F.3d 609 (4th Cir. 2013).

The recess appointment issue is currently before the Supreme Court in *NLRB v.*

*Noel Canning*, No. 12-1281.

<div style="margin-left: 40%;">

<u>/s/ Patrick Wyrick</u>
Patrick Wyrick
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
scott.pruitt@oag.ok.gov
(405) 521.3921

</div>

February 11, 2014                    *Counsel for the State of Oklahoma*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.......... i

TABLE OF CONTENTS................................................................vii

TABLE OF AUTHORITIES........................................................ ix

GLOSSARY ...........................................................................xiv

STATEMENT OF JURISDICTION ................................................ 1

STATEMENT OF ISSUES ........................................................... 1

STATUTES AND REGULATIONS ................................................ 1

INTRODUCTION ....................................................................... 2

STATEMENT OF THE CASE ....................................................... 3

    I.    The States' Investments In The Debt Of Large Financial
          Institutions................................................................ 3

    II.   Legal and Regulatory Background ..................................... 3

        A.    The Bankruptcy Code: Chapters 7 and 11 ............................... 3

        B.    Dodd-Frank's Title II: "Orderly Liquidation Authority" .......... 5

            1.    The Treasury Secretary's Liquidation Determination .... 5

            2.    Judicial Review Of The Secretary's Decision: A
                 Narrowly Limited, One-Day Appeal In District Court .... 6

            3.    The FDIC's Liquidation of the Company...................... 8

            4.    Judicial Review Of The FDIC's Liquidation Actions:
                 Repayment Caps, No Injunctions ................................. 9

            5.    Title II Prohibits Any Other Judicial Review,
                 Including Judicial Review Of The Constitutionality
                 Or Lawfulness Of A Liquidation ................................. 11

    III.   The States' Case In District Court ..................................................... 12

SUMMARY OF ARGUMENT ........................................................................ 14

STANDARD OF REVIEW ............................................................................. 15

ARGUMENT.................................................................................................... 16

    I.   The District Court Erred In Holding That Creditors Suffer No
        Injury When Congress Rescinds Its Previous Statutory Guarantee
        Of Creditors' Substantive Rights ......................................................... 16

           A.   The States' Loss Of Their Statutory Right Is An Immediate
               Injury In Fact ................................................................................. 18

           B.   The States Lost A Presently Valuable Statutory Right ........... 21

    II.   The District Court Erred In Holding That The States' Claims
        Would Ripen Only After Liquidation Occurs—Especially Because
        Dodd-Frank Prohibits Litigation Of Their Constitutional Claims
        Once Liquidation Begins................................................................... 27

CONCLUSION ................................................................................................ 31

STATEMENT PURSUANT TO D.C. CIRCUIT RULE ECF-3 ..................... 34

CERTIFICATE OF COMPLIANCE ............................................................... 35

CERTIFICATE OF SERVICE........................................................................ 36

STATUTORY ADDENDUM:

    11 U.S.C. § 726 (Chapter 7—"Distribution of property")................... Add. 1

    11 U.S.C. § 1123 (Chapter 11—"Contents of plan").......................... Add. 3

    12 U.S.C. § 5382 ("Judicial review")................................................... Add. 4

    12 U.S.C. § 5383 ("Systemic risk determination") .............................. Add. 8

    12 U.S.C. § 5390 ("Powers and duties of the [FDIC]") ...................... Add. 11

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45 (D.C. Cir. 2000) ....................... 28

*Begier v. IRS*, 496 U.S. 53 (1990) ........................................................................... 22

*Boese v. King*, 108 U.S. 379 (1883) ........................................................................ 22

\* *Clinton v. City of New York*, 524 U.S. 417 (1998) ........................................... 14, 19, 26

*Dolan v. City of Tigard*, 512 U.S. 374 (1994) .......................................................... 24

*Int'l Union v. Brock*, 783 F.2d 237 (D.C. Cir. 1986) ................................................. 30

*Lemon v. Kurtzman*, 411 U.S. 192 (1973) ................................................................ 26

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) ........................................................ 17

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) ............................................... 24

\* *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................... 14, 17

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................ 16

*Mayer v. Hellman*, 91 U.S. 496 (1875) .................................................................... 22

*Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996) .................. 16

*Nat'l Ass'n of Home Bldrs. v. U.S. Army Corps of Eng'rs*,
   417 F.3d 1282 (D.C. Cir. 2005) ........................................................................ 28

*Nat'l Ass'n of Home Bldrs. v. U.S. Army Corps of Eng'rs*,
   440 F.3d 459 (D.C. Cir. 2006) .......................................................................... 15

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004) ...... 15, 16

\*    Authorities upon which we chiefly rely are marked with asterisks.

\* *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1 (1977) ............................ 20, 21

*Warth v. Seldin*, 422 U.S. 490 (1975) ....................................................... 17

*Webster v. Doe*, 486 U.S. 592 (1988) ....................................................... 30

*Young v. Higbee Co.*, 324 U.S. 204 (1945) ................................................ 22

\* *Zivotofsky v. Sec'y of State*, 444 F.3d 614 (D.C. Cir. 2006) ........................................ 17

## U.S. CODE AND PUBLIC LAWS

11 U.S.C. § 105 ....................................................................................... 4

11 U.S.C. § 301 ....................................................................................... 4

11 U.S.C. § 303 ....................................................................................... 4

11 U.S.C. § 307 ....................................................................................... 4

11 U.S.C. § 341 ....................................................................................... 4

11 U.S.C. § 502(a) ................................................................................. 10

11 U.S.C. §§ 701 *et seq.* ......................................................................... 3

11 U.S.C. § 702 ....................................................................................... 4

11 U.S.C. § 704 ....................................................................................... 4

11 U.S.C. § 705 ....................................................................................... 4

11 U.S.C. § 705(b) ................................................................................. 4

\* 11 U.S.C. § 726(b) ............................................................................. 4, 21

11 U.S.C. § 727 ....................................................................................... 4

11 U.S.C. §§ 1101 *et seq.* ....................................................................... 3

11 U.S.C. § 1102 ................................................................................... 4

11 U.S.C. § 1104 ................................................................................ 4

11 U.S.C. § 1106 ................................................................................ 4

\* 11 U.S.C. § 1123(a)(4) ................................................................ 4, 21

11 U.S.C. § 1129 ................................................................................ 4

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......................... 1

12 U.S.C. § 5381(a)(11) .................................................................... 3

12 U.S.C. § 5382(a)(1)(A)(i) ............................................................ 6

12 U.S.C. § 5382(a)(1)(A)(ii) ........................................................... 7

12 U.S.C. § 5382(a)(1)(A)(iii) .............................................. 7, 11, 29

12 U.S.C. § 5382(a)(1)(A)(iv)(I) ..................................................... 8

12 U.S.C. § 5382(a)(1)(A)(v) ........................................................... 7

12 U.S.C. § 5382(a)(1)(A)(v)(II) ...................................................... 7

12 U.S.C. § 5382(a)(1)(A)(v)(III) .................................................... 7

12 U.S.C. § 5382(a)(1)(B) ............................................................ 7, 8

12 U.S.C. § 5382(a)(1)(C) ...................................................... 6, 7, 29

12 U.S.C. § 5382(a)(2)(A) ................................................................ 8

12 U.S.C. § 5382(a)(2)(A)(iv) ............................................... 8, 11, 29

12 U.S.C. § 5382(a)(2)(B)(iv) ............................................... 8, 11, 29

12 U.S.C. § 5383(a)(1) ...................................................................... 6

12 U.S.C. § 5383(b) ...................................................................... 5-6

12 U.S.C. § 5390(a)(1)(A) ................................................................ 8

12 U.S.C. § 5390(a)(1)(D) ................................................................. 9

12 U.S.C. § 5390(a)(1)(G)(i)(I) ........................................................ 8

12 U.S.C. § 5390(a)(1)(G)(i)(II) ...................................................... 8

12 U.S.C. § 5390(a)(3)(D)(i) ........................................................... 10

12 U.S.C. § 5390(a)(9)(D) .............................................................. 10

12 U.S.C. § 5390(a)(4) ......................................................... 9, 10, 29

\*  12 U.S.C. § 5390(b)(4) ............................................................ 9, 14

12 U.S.C. § 5390(c)(1) ..................................................................... 9

12 U.S.C. § 5390(d)(2) ....................................................... 9, 10, 11

12 U.S.C. § 5390(e) .................................................... 10, 11, 12, 30

12 U.S.C. § 5390(h)(1)(A) ............................................................... 9

28 U.S.C. § 158 ............................................................................... 4

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1331 ............................................................................. 1

28 U.S.C. § 1491 ........................................................................... 10

Act of Mar. 2, 1867, 39th Cong. Ch. 176 ..................................... 22

Pub. L. No. 105-34, 111 Stat. 788 (1997) .................................... 19

## LEGISLATIVE HISTORY

S. Rep. No. 111-176 (2010) ........................................................... 25

## MISCELLANEOUS

Douglas G. Baird & Edward R. Morrison, *Dodd-Frank for Bankruptcy Lawyers*,
19 Am. Bankr. Inst. L. Rev. 287 (2011)............................................................. 10

BlackRock, *ViewPoint: Financial Regulatory Reform—A Review of Legislation and
Implementation*, BlackRock.com (July 6, 2010) .................................... 27

7 Collier on Bankruptcy ¶ 1122.03 (2011) ............................................ 22

Benjamin Graham & David L. Dodd, Security Analysis (6th ed. 2009)........... 23, 24

Thomas H. Jackson, *Avoiding Powers in Bankruptcy*, 36 Stan. L. Rev. 725 (1984)... 5, 25

Thomas H. Jackson, The Logic and Limits of Bankruptcy Law (1986).......... 23, 26

Mark J. Roe & Frederick Tung, *Breaking Bankruptcy Priority: How Rent-Seeking
Upends The Creditors' Bargain*, 99 Va. L. Rev. 1235 (2013)................................... 22

Hal S. Scott, Interconnectedness and Contagion (2012) ........................................ 26

Charles Seligson, *The Code and the Bankruptcy Act: Three Views on Preferences and
After-Acquired Property*, 85 Banking L.J. 396 (1968) ............................................ 22

State Street Corp., Prospectus Supplement (to Prospectus Dated Mar. 2,
2012), Registration No. 333-179875 ................................................................. 27

## GLOSSARY

| | |
|---|---|
| Act ............................................... | Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) |
| Code ........................................... | The Bankruptcy Code |
| Complaint ("Compl.") ................ | Second Amended Complaint |
| Dodd-Frank ................................ | Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) |
| FDIC .......................................... | Federal Deposit Insurance Corporation |
| OLA ............................................ | Orderly Liquidation Authority |

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. It dismissed the Second Amended Complaint ("Compl.") on August 1, 2013; the States filed their notice of appeal the next day. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Title II of the Dodd-Frank Act[1] supersedes and abridges the Bankruptcy Code's longstanding guarantee that similarly situated creditors are entitled to equal treatment. Did the district court err in holding that the States were not injured by their loss of that right and therefore lacked standing to bring constitutional challenges against Title II?

2.     Did the district court err in holding the States' constitutional claims unripe until the States are mistreated in an "orderly liquidation" under Title II, when Title II itself prohibits all courts from hearing the States' constitutional claims *after* a liquidation begins?

## STATUTES AND REGULATIONS

All pertinent statutes are reprinted in the Statutory Addendum.

---

[1]    Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act" or "Act").

## INTRODUCTION

For creditors of large financial institutions, Title II of the Dodd-Frank Act expressly ends one of the Bankruptcy Code's core statutory rights: creditors' express right to be repaid equally with other similarly situated creditors. Title II replaced the Code's statutory right with new bureaucratic discretion to discriminate among similarly situated creditors. Some creditors may come out "winners" in a particular liquidation; others may come out losers—but regardless of who wins or loses dollars in any single liquidation, *all* of the creditors have lost the statutory right that long undergirded the market's transparency and rule of law.

Because the State Plaintiffs invest many millions of dollars in the bonds issued by large banks and financial companies, they were among the creditors whom Dodd-Frank stripped of their statutory right. They brought a case in federal court, challenging the entire Title II "Orderly Liquidation Authority" (OLA) framework as unconstitutional. But despite their loss of statutory rights, the district court held that the States suffer no injury and lack standing to bring a constitutional challenge in federal court to restore their rights. The district court's holdings are plainly erroneous and should be reversed.

The States are not arguing that it is unconstitutional for Congress ever to amend laws, or even to abridge statutory rights. But when Congress *does* pass an Act to strip away creditors' statutory rights, the creditors suffer a very real injury

from its enactment, and thus they have standing to litigate the merits of their constitutional claims against the new Act.

## STATEMENT OF THE CASE

### I.    The States' Investments In The Debt Of Large Financial Institutions

Each of the State Plaintiffs-Appellants[2] invests millions of dollars, from state pension funds or other state funds, in bonds issued by large financial institutions, including companies that qualify as "financial companies" for purposes of Dodd-Frank's Orderly Liquidation Authority. *See* J.A. __-__, __-__ (Compl. ¶¶ 23-44, and Exh. A-K); 12 U.S.C. § 5381(a)(11) (defining "financial company").

### II.    Legal and Regulatory Background

#### A.    The Bankruptcy Code: Chapters 7 and 11

Before Congress enacted Dodd-Frank's Title II, the bankruptcy of financial companies was governed predominantly by two chapters of the Bankruptcy Code. Under chapter 7 of the Code, companies could be "liquidated" (*i.e.*, wound down). 11 U.S.C. §§ 701 *et seq.* Under chapter 11, they could be reorganized. *Id.* §§ 1101 *et seq.*

---

[2]   Oklahoma, Alabama, Georgia, Kansas, Montana, Nebraska, Ohio, South Carolina, Texas, West Virginia, and Michigan Attorney General Bill Schuette on behalf of the People of the State of Michigan.

Traditional bankruptcy is a court-managed process with well-established creditor protections. It begins when a petition is filed in federal bankruptcy court, either by the debtor company or by creditors. 11 U.S.C. §§ 301, 303. Both the trustee elected by the creditors' committee and the United States trustee protect creditors' rights and interests. *See*, *e.g.*, 11 U.S.C. §§ 341, 705 (creditors' committee meeting); *id.* §§ 702, 1104 (election of the creditors' trustee); *id.* §§ 704, 1106 (duties of the creditors' trustee); *id.* §§ 307, 705(b), 1102 (United States trustee). Bankruptcy judges manage the process, with ultimate authority in chapter 11 to approve or disapprove reorganization plans, *id.* § 1129, and in chapter 7 to discharge debtors, *id.* § 727. The bankruptcy court's decisions are subject to review by the district court, court of appeals, and Supreme Court. *See*, *e.g.*, *id.* § 105 (bankruptcy court's powers); 28 U.S.C. § 158 (district court's appellate jurisdiction in bankruptcy).

But creditors' rights in bankruptcy are not merely procedural. Most important, for present purposes, the Bankruptcy Code guarantees each creditor's right to be treated equally with all other similarly situated creditors. In chapter 7, similarly situated creditors are entitled to payments "made pro rata among" valid claims. 11 U.S.C. § 726(b). In chapter 11, a reorganization plan must "provide the same treatment for each claim or interest of a particular class," unless the creditor himself waives this right. *Id.* § 1123(a)(4). Absent these protections and other rights

4

defined in the Bankruptcy Code *ex ante*, default (or even the fear of default) could spur creditors to "race for assets, not necessarily just to grab more than his share but also simply to avoid being left with nothing." Thomas H. Jackson, *Avoiding Powers in Bankruptcy*, 36 Stan. L. Rev. 725, 758-59 (1984).

## B. Dodd-Frank's Title II: "Orderly Liquidation Authority"

The Dodd-Frank Act, enacted in 2010, creates a framework that differs from traditional bankruptcy both in form and in substance. Where Chapter 7 and 11 bankruptcies begin with a party's public petition and protect the parties by active judicial management and thorough judicial review, Dodd-Frank "liquidation" begins with secret government action, is directed by regulators, and is ultimately subject to strict limits on judicial review for some parties and issues—and *no* judicial review for others.

### 1. The Treasury Secretary's Liquidation Determination

Title II of the Dodd-Frank Act empowers the Treasury Secretary to order the liquidation of covered financial company if he finds, *inter alia*, that:

- the company is a "financial company" as defined by Title II;

- the company is "in default or in danger of default";

- the company's default would, absent his intervention, have "serious adverse effects on financial stability in the United States";

- no "viable private-sector alternative" to Title II liquidation is "available";

- Title II liquidation would "avoid or mitigate" the default's "adverse effects" on financial stability; and

- "any effect on the claims or interests of creditors" and other stakeholders would be "appropriate, given the impact" that liquidation would have on financial stability.

*See* 12 U.S.C. § 5383(b).[3]

The Treasury Secretary's decision to liquidate the company is not disclosed to creditors, shareholders, or the public; a person who "recklessly discloses" the liquidation decision may be imprisoned up to five years and fined up to $250,000. *See id.* § 5382(a)(1)(C).

### 2. Judicial Review Of The Secretary's Decision: A Narrowly Limited, One-Day Appeal In District Court

If the company elects to "acquiesce or consent" to the Treasury Secretary's decision, then there is no opportunity for administrative or judicial appeal by shareholders, creditors, or other stakeholders—who, again, will not have been informed of the Secretary's decision until after it takes effect. *Id.* § 5382(a)(1)(A)(i).

But if the targeted company refuses to "acquiesce or consent," then the Treasury Secretary petitions the U.S. District Court for the District of Columbia to affirm his decision. *Id.* § 5382(a)(1)(A)(i). The targeted company

---

[3]   The Treasury Secretary can make these findings once the Federal Deposit Insurance Corporation (FDIC) and Federal Reserve Board of Governors recommend liquidation in light of a similar list of factors. *Id.* § 5383(a)(1).

receives the Secretary's petition under seal, subject to criminal penalties for disclosure. *Id.* § 5382(a)(1)(A)(ii) (under seal); *id.* § 5382(a)(1)(A)(iii) ("confidential" judicial review "without any prior public disclosure"); *id.* § 5382(a)(1)(C) (penalties).

The district court is permitted to review only two of the Secretary's seven findings: whether the company is a "financial company," and whether the company is "in default or in danger of default." *Id.* § 5382(a)(1)(A)(iii). And the district court reviews those two findings under the deferential arbitrary-and-capricious standard. *Id.* The Secretary's other findings—regarding possible nationwide systemic impacts, the availability of private sector alternatives, the burdens on creditors, and other considerations—are exempt from judicial review.

In addition to these restrictions on the scope of the appeal, the district court's review is also strictly limited in time. The district court must issue its final decision on the merits within *twenty-four hours* of receiving the Treasury Secretary's petition; if the court does not rule against the Secretary's decision within twenty-four hours, then the Secretary wins by default and may immediately begin the liquidation process. *Id.* § 5382(a)(1)(A)(v). The twenty-four hour deadline cannot be stayed—the court must make its final "determination" before the deadline expires. *Id.* §§ 5382(a)(1)(A)(iii), 5382(a)(1)(A)(v), 5382(a)(1)(B).

Once the district court's twenty-four hour review has ended, the liquidation process can begin immediately. *Id.* § 5382(a)(1)(A)(v)(II)-(III). The

liquidated company can appeal to this Court, *id.* § 5382(a)(2)(A), but the Act bars this Court from staying the liquidation pending appeal, *id.* § 5382(a)(1)(B). And on appeal this Court and the Supreme Court, like the district court, are limited to hearing only two issues: whether the debtor was in default or in danger of default and whether it was a "financial company." *Id.* § 5382(a)(2)(A)(iv) (court of appeals); *id.* § 5382(a)(2)(B)(iv) (Supreme Court). The courts cannot review the Treasury Secretary's other findings, such as the company's threat to "financial stability" or the burdens on creditors.

### 3.    The FDIC's Liquidation of the Company

Upon initiating the liquidation, the Treasury Secretary appoints the FDIC as "receiver." *Id.* § 5382(a)(1)(A)(iv)(I). The FDIC has broad powers, "succeed[ing] to . . . all rights, titles, powers, and privileges of the covered financial company and its assets, and of any stockholder, member, officer, or director[.]" *Id.* § 5390(a)(1)(A).

A Dodd-Frank "liquidation" is not limited to simply breaking up and winding down the company. Instead, Title II authorizes the FDIC to merge the company with another company, *id.* § 5390(a)(1)(G)(i)(I), or to sell the company's assets "without obtaining any approval, assignment, or consent with respect to such transfer," *id.* § 5390(a)(1)(G)(i)(II). Title II authorizes the FDIC to transfer the company's assets and claims to a "bridge financial company" owned and controlled

by the FDIC. *Id.* §§ 5390(a)(1)(D), 5390(h)(1)(A). The FDIC can repudiate any contract or lease that it finds to be "burdensome." *Id.* § 5390(c)(1).

Most important for present purposes, Dodd-Frank eliminates the creditors' preexisting statutory right against nondiscrimination. The FDIC "may take any action" to give disparate treatment among similarly situated creditors, if it deems such discrimination necessary to achieve the Act's stated objectives. *Id.* § 5390(b)(4).

### 4. Judicial Review Of The FDIC's Liquidation Actions: Repayment Caps, No Injunctions

If a creditor is dissatisfied with the payment it was awarded by the FDIC, then it may appeal to the U.S. District Court in the district of the liquidated company's principal place of business. *Id.* § 5390(a)(4). But the Act caps the amount the creditor can receive from the FDIC on his claim: it cannot receive an amount greater than it "would have received" if the FDIC "had not been appointed receiver with respect to the" liquidated company and instead the liquidated company "had been liquidated under chapter 7 of the Bankruptcy Code" or applicable state insolvency law. *Id.* § 5390(d)(2).

Those recovery caps, based on a hypothetical chapter 7 wind-down of the company, apply even if the company would have been reorganized under chapter 11 instead of being wound down. According to leading bankruptcy scholars, this alternative-universe inquiry requires the FDIC to "imagine the

liquidation value of the institution in an economy that is suffering an economic collapse. *That liquidation value is likely to be close to zero.*" Douglas G. Baird & Edward R. Morrison, *Dodd-Frank for Bankruptcy Lawyers*, 19 Am. Bankr. Inst. L. Rev. 287, 316 (2011).[4]

Finally, creditors appealing the FDIC's liquidation actions cannot challenge the constitutionality of the Treasury Secretary's liquidation decision. The issue before the district court is only the proper "determination of claims," 12 U.S.C. § 5390(a)(4), and the court's remedies are limited to money damages, in accordance with the statutory measure of (and cap on) damages, *id.* § 5390(e).[5] The court cannot give claimants an injunction blocking the liquidation process, nor can claimants challenge the merits of the Treasury Secretary's original decision. *Id.*

---

[4]   Moreover, Title II effectively reverses the burden of proof that usually governs creditors' claims in bankruptcy. Under the Bankruptcy Code, a claim is allowed "unless a party in interest . . . objects" to the claim in bankruptcy court. 11 U.S.C. § 502(a). But in Title II liquidations the burden falls upon the creditor to "prov[e]" his claim "to the satisfaction of the" FDIC. 12 U.S.C. § 5390(a)(3)(D)(i).

[5]   Thus, Title II also supersedes the Tucker Act's remedy for government deprivations of property. *See* 12 U.S.C. § 5390(a)(9)(D); *cf.* 28 U.S.C. § 1491. Unlike the Tucker Act, Title II limits claimants' recoveries by an artificial rubric (*i.e.*, a hypothetical chapter 7 bankruptcy), even if a creditor's actual losses far exceed that. 12 U.S.C. § 5390(d)(2).

### 5. Title II Prohibits Any Other Judicial Review, Including Judicial Review Of The Constitutionality Or Lawfulness Of A Liquidation

Having prescribed those two strictly limited avenues for judicial review, Title II closes all other courthouse doors by prohibiting all courts from taking "any [other] action to restrain or affect the exercise of powers or functions" of the FDIC in an ongoing liquidation. *Id.* § 5390(e).

That prohibition against collateral judicial review of in-progress liquidations, combined with Title II's strict substantive and procedural limits on the prescribed avenues for judicial review, prevents any court from reviewing the constitutionality of Dodd-Frank's Title II once a liquidation has begun. Judicial review of the Treasury Secretary's liquidation decision is limited to whether the company is a "financial company" and in default.[6] *See supra* pp. 5-8. Creditors appealing the FDIC's payment decisions cannot get an injunction blocking the Title II process as unconstitutional, *id.* § 5390(e); they can ask only for money, and only in accordance with the narrowed statutory standard (*i.e.*, hypothetical recovery in a chapter 7 wind-down), *id.* § 5390(d)(2). With constitutional claims thus removed from those appeals, and with all other courts barred from taking "any action to restrain or affect the powers or functions of" the FDIC's liquidation,

---

[6]  *Id.* § 5382(a)(1)(A)(iii) (scope of review in district court); *id.* § 5382(a)(2)(A)(iv) (court of appeals); *id.* § 5382(a)(2)(B)(iv) (Supreme Court).

*id.* § 5390(e), Title II precludes constitutional challenges to (or injunctions against) an in-progress liquidation.

## III.   The States' Case In District Court

The Private Plaintiffs' original complaint stated claims against Title X's Consumer Financial Protection Bureau and Title I's Financial Stability Oversight Council. *See* Private Pls.' Br. 11-12. Plaintiffs amended their complaint on September 20, 2012, adding three constitutional claims against Title II: that it violates the Constitution's separation of powers (J.A. __-__ [Compl. ¶¶ 226-43]); that it violates the Fifth Amendment's Due Process Clause (*id.* at __-__ [Compl. ¶¶ 244-49]); and that it violates the Constitution's requirement that bankruptcy laws be "uniform" (*id.* at __-__ [Compl. ¶¶ 250-55]). The first three State Plaintiffs[7] joined in that amended complaint; the other eight joined in the second amended complaint on February 19, 2013. The States challenge only Title II.

To support their standing to bring these claims, the States alleged that, "[o]n its face, [Title II] abrogates the rights under the U.S. Bankruptcy Code of creditors of institutions that could be liquidated, destroying a valuable property right held by creditors—including the State Plaintiffs—under bankruptcy law, contract law, and other laws, prior to the Dodd-Frank Act." J.A. __ (Compl.

---

[7]   Oklahoma; South Carolina; and Michigan Attorney General Bill Schuette, on behalf of the people of the State of Michigan.

12

¶ 170). This was a statutory right that States had retained as creditors in large financial institutions. J.A. __ (Compl. ¶ 169) (citing Exhibits A-K, listing many of the financial companies the States invest in). The States warned that the present loss of their valuable statutory right also gave rise to "a present and ongoing substantial risk of direct economic harm." J.A. __ (Compl. ¶ 171).

Despite Title II's express elimination of creditors' pre-existing statutory nondiscrimination guarantee, the district court held that the States have not yet suffered an actual injury. The court agreed that the States "hold[] certain statutory rights" under the pre-Dodd-Frank bankruptcy laws.  J.A. __ (Op. at 21). But the court nevertheless concluded that the injuries alleged and documented by the States were insufficiently actual and concrete, "since the OLA exists only on paper at this point of time" and had not yet imposed a specific financial loss upon the States. J.A. __ (Op. at 25).

The district court also held that the States' claims would not ripen until an "orderly liquidation" actually is carried out under Title II. J.A. __-__ (Op. at 27-29). The district court concluded that preventing the States from litigating these claims *before* liquidation occurs "would not inflict a hardship on the challengers." J.A. __ (Op. at 28) (brackets omitted). The district court did not acknowledge that Dodd-Frank *prohibits* creditors from litigating Title II's constitutionality, or the legal and factual validity of the Treasury Secretary's

findings, *after* an "orderly liquidation" begins. *See* J.A. __-__ (State Pls.' Opp. to Mot. to Dismiss at 28-30).

## SUMMARY OF ARGUMENT

The district court erred when it concluded that the States lack standing until the FDIC mistreats them in a Title II liquidation. No matter when (or if) the plaintiffs ultimately lose money in an "orderly liquidation," their present loss of statutory rights previously guaranteed by law suffices to give them standing to bring this case.

An injury "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992) (quotation marks omitted). That is the nature of the State Plaintiffs' injury in this case, as specifically pleaded in their complaint: The Bankruptcy Code has long protected the States' legal rights, as creditors, to equal treatment among similarly situated creditors in bankruptcy. *See infra* pp. 21-27. But the Dodd-Frank Act terminated those rights, on the face of Title II itself. 12 U.S.C. § 5390(b)(4). Title II's abridgement of the States' legal rights causes them injury and gives them standing to challenge Title II's constitutionality. *Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998).

The district court erred in assuming that the States will not lose their statutory rights unless and until they are mistreated in an "orderly liquidation." As

14

a matter of fact, they already have lost their valuable statutory rights as creditors. To focus exclusively on possible future financial losses, as the district court and Government did, is to fundamentally misunderstand the basic point of these creditors' rights, which serve as the legal framework around which creditors and other stakeholders arrange their affairs *today*, before any company defaults.

Finally, the States' claims are ripe. Their pure questions of law satisfy the well-established standards of ripeness, and the Government identifies no hardship that it would suffer by immediate adjudication of these claims. Indeed, while both the district court and the Government assert that the States must wait to suffer substantial financial losses in a liquidation before they are allowed to bring these constitutional claims in court, the fact remains that the Dodd-Frank Act expressly *prohibits* the courts from hearing such claims once a liquidation begins. Congress's prohibition against *post*-liquidation judicial review of the States' constitutional claims strongly implies its corresponding preference for *pre*-liquidation judicial review of those constitutional claims.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's decision as to standing and ripeness. *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004) (standing); *Nat'l Ass'n of Home Bldrs. v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 461 (D.C. Cir. 2006) (ripeness). Because the district court "disposed of

15

appellants' complaint on a motion to dismiss," this Court "must assume that general factual allegations in the complaint embrace those specific facts that are necessary to support the claim." *Nat'l Wrestling Coaches*, 366 F.3d at 938. And if one plaintiff's standing can be shown for each claim, the Court needs not consider the other plaintiffs' standing to bring that claim. *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

The States are entitled to "special solicitude" with respect to their standing to sue in defense of their own sovereign and quasi-sovereign interests. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). But in this case no "special solicitude" is needed, because the allegations set forth in the Complaint already satisfy "the most demanding standards of the adversarial process." *Id.* at 521.

## ARGUMENT

## I. The District Court Erred In Holding That Creditors Suffer No Injury When Congress Rescinds Its Previous Statutory Guarantee Of Creditors' Substantive Rights

The Bankruptcy Code created legal rights for creditors, including the right of equal treatment for similarly situated creditors. *See supra* pp. 4-5. Those rights were created not only to protect creditors *after* a debtor defaults, but also to provide creditors *ex ante* assurance of their legal rights, to allow creditors to operate in markets and prudently plan their affairs *today*. *See infra* pp. 21-27. By removing

16

creditors' core statutory right, Title II causes the States a present, actual injury giving them standing to challenge Title II's constitutionality.

For purposes of standing, an "injury" is an "invasion of a legally protected interest," *Lujan*, 504 U.S. at 560. Financial losses are *one* type of injury, but they are not the *only* injuries: a plaintiff's injury "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Id.* at 578 (quotation marks omitted) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). "Although it is natural to think of an injury in terms of some economic, physical, or psychological damage, a concrete and particular injury for standing purposes can also consist of the violation of an individual right conferred on a person by statute." *Zivotofsky v. Sec'y of State*, 444 F.3d 614, 619 (D.C. Cir. 2006). What matters is that there is "the violation of an *individual* right," affecting the plaintiff "in an individual and personal way." *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1).

This is not to say that Congress can manufacture standing out of whole cloth by simply "confer[ring] jurisdiction on Art. III courts to render advisory opinions." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973). But when Congress "enact[s] statutes creating legal rights," the loss of those rights "creates standing even though no injury would exist without the statute," *id.*, and even if the plaintiff has not suffered any additional "economic, physical, or psychological damage," *Zivotofsky*, 444 F.3d at 619.

17

The district court conceded that statutory rights can give rise to standing, but it concluded nonetheless that in this case the State Plaintiffs still lack standing to challenge Title II because they "have not shown" a "*concrete, present injury*." J.A. __ (Op. at 22). In drawing that conclusion, the district court assumed that there could be no concrete "loss" of the States' statutory right against discrimination unless and until the States are forced to bear an economic loss by the FDIC in an orderly liquidation. *See id*. at 23 ("in this case no violation of any statutory right has occurred and it may never occur in the future").

The district court's analysis is doubly flawed. First, it ignores that the legislative repeal of a plaintiff's substantive statutory right imposes an actual injury no less than when an agency obstructs the plaintiff's exercise of the same right. Second, the court failed to recognize that the States' right to equal treatment, which they lost when Title II was enacted, had immediate value regardless of whether and when a particular liquidation eventually takes place.

## A.     The States' Loss Of Their Statutory Right Is An Immediate Injury In Fact

The district court presumed that the creditors' loss of a statutory right is insufficiently "concrete" because the creditors have not yet needed to assert those rights in a Title II liquidation. *See* J.A. __ (Op. at 22-25). But that reasoning contradicts the Supreme Court's common-sense explanation that market

18

participants are injured by the repeal of statutory rights and benefits even if they have not yet had the need or opportunity to "fully" utilize those rights.

In *Clinton v. City of New York*, the Taxpayer Relief Act of 1997 amended the Internal Revenue Code to give favorable tax treatment to owners of food refiners and processers when they sell stock to farmers cooperatives; the amendment was intended to encourage the owners to sell their stock to the farmers cooperatives. 524 U.S. 417, 424 (1998). But President Clinton later used the "line item veto" to repeal the tax-benefit provision, just days after he had signed the statute into law. *Id.* [8] The Supreme Court held the removal of that statutory tax benefit was an "immediate injury" to a farmer's cooperative that had wanted to purchase such assets. *Id.* at 432. The farmers' injury was not mitigated by the fact that they had not yet leveraged the tax statute to actually purchase a processing plant; rather, the court recognized that a statute's guarantee of favorable tax treatment was, in and of itself, "the equivalent of a statutory 'bargaining chip' to use in carrying out" future negotiations. *Id.*

Indeed, the farmers' loss of their statutory "bargaining chip" was even *less* concrete than the States' loss of creditors rights in this case. Unlike creditors rights, which have been enacted law for well over a century, the tax subsidy in *City*

---

[8]    President Clinton signed the tax benefit (Pub. L. No. 105-34, 111 Stat. 788) into law on August 5, 1997, and he cancelled it on August 11, 1997, *see* 524 U.S. at 425.

*of New York* had been signed into law less than a week before President Clinton abridged it. And unlike creditors under the Bankruptcy Code, the farmers were not even the primary beneficiaries of the tax statute—the future *sellers* were.

Similarly, the Supreme Court recognized in *United States Trust Co. of New York v. New Jersey* that bondholders' statutory protections under state law were impaired when the states repealed the laws that had protected the bonds' revenue base, even though the bondholders had not suffered a default on the bonds nor had they sustained a loss in the bonds' market prices. 431 U.S. 1, 17-19 (1977). In that case, New York and New Jersey had enacted "covenant" legislation protecting revenue streams to be used to pay off Port Authority bonds. *Id.* at 3, 9-12. When the states later repealed that legislation (*id.* at 13-14), the mere fact of repeal sufficed for the Court to recognize that the bondholders' contracts had been impaired in violation of the Contracts Clause. *Id.* at 19. The Supreme Court recognized the bondholders' loss of valuable rights even though "no one can be sure precisely how much loss the bondholders suffered" in the markets by the mere act of repeal—indeed, the Court recognized that the bonds retained their "A" rating and that the bonds "regained a comparable price position in the market" after the repeal. *Id*. The Court held that the state defendants' impairment of the bondholders' rights was inherent in the states' "outright repeal" of the covenant

20

legislation, which "totally eliminated an important security provision" of the bonds. *Id.* at 19.

The States' creditors rights in the present case, like the bondholders' protections in *U.S. Trust*, were "not superfluous"; in each case, the statutory protections existed to "protect[]" the creditors' investments. *Id.* The bondholders' loss of protection in *U.S. Trust* was not ameliorated by the mere possibility that the Port Authority would still repay the bonds on time; their loss was the statutory protection *per se*, not the further economic consequences that might or might not follow. The bondholders in that case, like the State bondholders in the present case, were injured simply by the repeal of "an important security provision." *Id.*

## B.      The States Lost A Presently Valuable Statutory Right

The district court also ignored the fact that the statutory rights eliminated by Dodd-Frank's enactment did indeed have real, present, pre-default value to the States. *See* J.A. __ (Compl. ¶ 170) ("a valuable property right held by creditors"). As noted above, the Bankruptcy Code guaranteed that similarly situated creditors are entitled to equal treatment. *Supra* pp. 4-5 (citing 11 U.S.C. §§ 726(b), 1123(a)(4)). Those rights are "a *central policy* of the Bankruptcy Code,"

*Begier v. IRS*, 496 U.S. 53, 58 (1990) (emphasis added), for well over a century,[9]

their importance recognized by the Supreme Court[10] and scholars.[11]

Creditors' statutory rights against discrimination do not merely

provide practical value *after* a debtor goes into default—rather, the Code's statutory

guarantee to creditors is the "cornerstone of the bankruptcy structure" precisely

because of the role it plays *before* a debtor falls into financial distress. *See* Charles

Seligson, *The Code and the Bankruptcy Act: Three Views on Preferences and After-Acquired

Property*, 85 Banking L.J. 396, 396 (1968) ("It would be highly inequitable to

disregard what transpires prior to the filing of the bankruptcy petition; to do so

would encourage a race among creditors . . . and result in inequality of

---

[9]   *See, e.g.*, Act of Mar. 2, 1867, 39th Cong. Ch. 176, § 27 ("all creditors whose debts are duly proved and allowed shall be allowed to share in the bankrupt's property and estate pro rata, without any priority or preference whatever").

[10]   *See, e.g., Mayer v. Hellman*, 91 U.S. 496, 501 (1875) ("The great object of the Bankrupt Act, so far as creditors are concerned, is to secure equality of distribution among them of the property of the bankrupt."); *Boese v. King*, 108 U.S. 379, 385-86 (1883) ("the paramount force of the bankrupt act, the primary object of which, as this court has frequently announced, was to secure equality among the creditors of a bankrupt"); *Young v. Higbee Co.*, 324 U.S. 204, 210 (1945) ("historically one of the prime purposes of bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets, to protect the creditors from one another").

[11]   *See, e.g.*, 7 Collier on Bankruptcy ¶ 1122.03 (2011) ("One of the cardinal principles underlying bankruptcy law is equality of treatment of similarly situated creditors."); Mark J. Roe & Frederick Tung, *Breaking Bankruptcy Priority: How Rent-Seeking Upends The Creditors' Bargain*, 99 Va. L. Rev. 1235, 1244-45 (2013) ("Indeed, policymakers see bankruptcy priority as fundamental to sound business, with bankruptcy's fundamental goal being to establish a single, clear hierarchy of payments." (brackets and quotation marks omitted)).

distribution."); *cf.* Thomas H. Jackson, The Logic and Limits of Bankruptcy Law 17 (1986) ("Bankruptcy law *stipulates a minimum set of entitlements* for claimants. That, in turn, permits them to 'bargain in the shadow of the law' and to implement a consensual collective proceeding outside of the bankruptcy process.") (emphasis added).

First, the right guarantees to individual creditors and the broader market that bondholders will at least recoup a pro rata share of the debtor property remaining for the entire creditor class. This security provision itself has value to the States: had they wanted a riskier investment, they could have bought stock, or lesser bonds, instead. *See*, *e.g.*, Benjamin Graham & David L. Dodd, Security Analysis 149 (6th ed. 2009) ("Obviously a junior lien should be preferred [to a senior lien] only if the advantage in income return is substantial. Where the first-mortgage bond yields only slightly less, it is undoubtedly wise to pay the small insurance premium for protection against unexpected trouble."). Bonds are appealing precisely because of their greater predictability and priority, and by buying the bonds the States bargained for the benefit of heightened statutory rights, including the rights against nondiscrimination.

Nor is their value disproven by the fact that the States have not yet needed to exercise those rights in an "orderly liquidation," any more than an insurance policy's present value would be disproven by the fact that the

23

policyholder has not yet suffered the catastrophe that he's insuring against. *See id.* at 147 ("the primary aim of the bond buyer must be to avoid trouble and not to protect himself in the event of trouble"). If, by analogy, an insured's policy were unilaterally repudiated or changed before the contingencies covered by the policy were reasonably expected to occur, he still would lose something of value—so have the States here. The States chose to pay a premium for the risk-allocating rights inherent in bonds; by losing those rights, they lost that inherent value. J.A. __ (Compl. ¶ 170) ("a valuable property right held by creditors").

The value of the Bankruptcy Code's right against creditor discrimination is also illustrated by thinking of the bonds, like any property, as a "bundle of sticks." *See Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992) ("bundle of rights"). The "background principles" of law that define the property holder's rights and obligations with respect to the property are among those "sticks." *Lucas*, 505 U.S. at 1029. When Congress enacted Title II and eliminated creditors' statutory right to equal treatment, the States immediately lost something of real value. *See* J.A. __ (Compl. ¶ 170). As the Government itself explained in district court, creditors now enjoy a mere "presumption" that rights once protected by the Bankruptcy Code

will still be honored.[12] Having bought bonds that had been protected with a statutory right against discrimination, the States—rational investors—understand the difference between a statutory *right* and a mere "*presumption*," and they are keenly aware of the value that they lose when the former is unilaterally replaced with the latter.

Second, the Code's statutory guarantee lends structure to the markets even before a default occurs. Creditors "would agree to this system before they lent money" because the Bankruptcy Code's structure of creditor rights solves "the usual problems of policing a deal after it is struck." Jackson, 36 Stan. L. Rev. at 758. The Code's creditor rights are the "mechanism to bind them to their presumptive ex ante agreement and to foil the attempts of each creditor to welsh on the agreement for individual gain." *Id.* at 758-59. If rights and priorities were not defined and protected *before* default, then individual creditors fearful of default would race to obtain value before default occurs; in such a scenario, "[b]y the time a bankruptcy petition is actually filed, and without reach-back provisions, those creditors that remained would have to share equally in 'tag ends and remnants' of assets." *Id.* at 759.

---

[12] J.A. __ (Defs.' Mot to Dismiss at 12 (quoting S. Rep. No. 111-176, at 4 (2010))) (emphasis added).

Scholars already have concluded that Title II's modification of the bankruptcy laws affects the basic market risks that creditors face *now*. Because creditors do not know *ex ante* whether a financial company will be liquidated under the old Bankruptcy Code or under the new Title II, and because they do not know *ex ante* how regulators will treat them in an "orderly liquidation," Title II "adds another layer of uncertainty for creditors of financial companies *who could run at an earlier point* in time in order to avoid impairment in the OLA receivership." Hal S. Scott, Interconnectedness and Contagion 216-17 (2012) (emphasis added).

Finally, because creditors' rights are codified *ex ante*, creditors can leverage their statutory rights as a bargaining chip, allowing creditors to "bargain in the shadow of the law[.]" Jackson, The Logic and Limits of Bankruptcy Law at 17; *cf. Lemon v. Kurtzman*, 411 U.S. 192, 199 (1973) ("statutory or even judge-made rules of law are hard facts on which people must rely in making decisions and in shaping their conduct"). That bargaining chip, like the "statutory bargaining chip" recognized in *Clinton v. City of New York*, is not devalued by the fact that its holder has not yet used the chip to strike a bargain. 524 U.S. at 432.[13]

Market participants recognize the injuries that Title II imposes upon bondholders. State Street Corp. warned prospective bondholders that there "are

---

[13]  Thus, the States never have described their statutory right as "inalienable," the district court's assertion to the contrary notwithstanding. J.A. __ (Op. at 21).

substantial differences in the possible treatment of creditors under the orderly liquidation authority compared to that under the U.S. Bankruptcy Code, including the right of the FDIC to disregard the strict priority of creditor claims in some circumstances." State Street Corp., Prospectus Supplement (to Prospectus Dated Mar. 2, 2012), Registration No. 333-179875, at p. S-10.[14]

BlackRock, the world's largest asset manager, reviewed Title II and warned that "permitting discrimination among bondholders is clearly a negative for capital markets," and prospective bond buyers will need to "demand a premium for this uncertainty." BlackRock, *ViewPoint: Financial Regulatory Reform—A Review of Legislation and Implementation* 2, BlackRock.com ( July 6, 2010).[15]

## II. The District Court Erred In Holding That The States' Claims Would Ripen Only After Liquidation Occurs—Especially Because Dodd-Frank Prohibits Litigation Of Their Constitutional Claims Once Liquidation Begins

The States pleaded three facial challenges to Dodd-Frank's Title II: that it violates the Constitution's separation of powers, the Fifth Amendment's guarantee of due process, and the Bankruptcy Clause's guarantee of "uniform" bankruptcy laws. J.A. __-__ (Compl. ¶¶ 226-55). Those facial challenges are

---

[14] *Available at* http://secfilings.nyse.com/filing.php?doc=1&attach=ON&ipage= 9235793&rid=23 (last visited April 11, 2014).

[15] https://www2.blackrock.com/webcore/litService/search/getDocument .seam?venue=PUB_IND&source=GLOBAL&contentId=1111124998

"purely legal claims" and thus "presumptively reviewable." *Nat'l Ass'n of Home Bldrs. v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005).

The district court did not dispute that the States' facial challenges are "pure legal" issues. J.A. __ (Op. at 28). Yet the court still held them unripe, because it saw them as "rest[ing] upon contingent future events"—namely, a future liquidation—"that may not occur as anticipated, or indeed may not occur at all." *Id.* According to the district court, "the States ask the Court to invalidate all of Title II, despite the fact that none of the OLA powers have been invoked" and "may never be invoked in matters concerning the States." *Id.* (alterations and quotation marks omitted). This reasoning mischaracterizes both the States' claims and the requirements of Dodd-Frank.

First, the district court once again mischaracterized the nature of the States' claims. They do not "rest" upon "contingent future events." Rather, their claims arise from the loss of valuable statutory rights that the States already have suffered, not on further economic losses that may or may not someday occur. *Supra* pp. 18-27. Nor would the occurrence of a Title II liquidation "bring the issues into greater focus or assist [this Court] in determining them." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000). Their constitutional claims are directed at the structure of Title II *per se*, not the manner in which the Treasury

28

Secretary, the FDIC, or the Federal Reserve Board of Governors ultimately administer those powers.

Second, delaying litigation of the State Plaintiffs' claims until after an "orderly liquidation" occurs cannot clarify the issues for future judicial resolution, because Title II expressly *prevents* judicial resolution of the States' substantive constitutional claims in an appeal of a Title II liquidation. As explained above, the States cannot raise these issues in the district court's 24-hour review of the Treasury Secretary's liquidation determination, because the States and other creditors cannot even know about, let alone participate in, that review. *See* 12 U.S.C. § 5382(a)(1)(A)(iii), (a)(1)(C). Indeed, these constitutional claims cannot be litigated at all in the district court's 24-hour review or in subsequent appeals, because the court's jurisdiction in those cases is expressly limited to two issues: whether the targeted company is a "financial company," and whether the company was in default or in danger of default. *Id.* § 5382(a)(1)(A)(iii) (district court); *id.* § 5382(a)(2)(A)(iv) (court of appeals); *id.* § 5382(a)(2)(B)(iv) (Supreme Court). Nor can the States' constitutional claims be litigated on appeal of the FDIC's payment decisions, because such cases simply provide "judicial determination of claims," 12 U.S.C. § 5390(a)(4), and not a judicial determination of whether Title II, on its face, violates the Constitution. Nor does that appeal allow for injunctive relief to block the enforcement of Title II; the relief available against the FDIC is strictly

29

"limited to money damages determined in accordance with [Title II]."
*Id.* § 5390(e). Finally, once a liquidation begins, Title II purports to bar all federal courts from hearing any case that would "restrain or affect the exercise of powers or functions of" the FDIC under Title II. *Id.* So the States and other affected creditors could not file suit in another court to adjudicate the constitutional issues.[16]

A "serious constitutional question" would arise "if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Thus, where Congress has expressly prohibited *post*-liquidation litigation of these constitutional claims strongly, it strongly implies its preference for *pre*-liquidation litigation of the claims.

When the "choice is between addressing the challenge in its current setting or permanently *withholding* judicial review" of Title II's constitutionality, "the hardship of permanently foreclosing review is clearly sufficient to make the challenge ripe." *Int'l Union v. Brock*, 783 F.2d 237, 251-52 (D.C. Cir. 1986) (emphasis in original). The States should not be forced to bear such a hardship. They are presently injured by the Dodd-Frank Act's abridgement of their longstanding statutory rights, and their constitutional claims are ripe.

---

[16]   In the present case, neither the district court nor the Government identified any provision of Dodd-Frank allowing for post-liquidation judicial review of the States' constitutional issues.

## CONCLUSION

The judgment of the district court should be reversed, the defendants' motion to dismiss should be denied, and this case should be allowed to proceed to the merits of the States' constitutional claims.

Respectfully submitted,

/s/ E. Scott Pruitt

| | |
|---|---|
| Alan Wilson<br>*Attorney General of South Carolina*<br>James Emory Smith, Jr.<br>Rembert Dennis Building<br>1000 Assembly Street, Room 519<br>Columbia, S.C. 29201<br>agalanwilson@scag.gov<br>(803) 734-3970<br><br>*Counsel for the State of South Carolina* | E. Scott Pruitt<br>*Attorney General of Oklahoma*<br>Patrick Wyrick<br>Office of the Attorney General<br>313 NE 21st Street<br>Oklahoma City, OK 73105<br>scott.pruitt@oag.ok.gov<br>(405) 521.3921<br><br>*Counsel for the State of Oklahoma* |
| Luther Strange<br>*Attorney General of Alabama*<br>Andrew L. Brasher<br>Office of the Attorney General<br>501 Washington Avenue<br>Montgomery, AL 36104<br>(334) 242-7300<br><br>*Counsel for the State of Alabama* | Samuel S. Olens<br>*Attorney General of Georgia*<br>John E. Hennelly<br>Georgia Department of Law<br>40 Capitol Square SW<br>Atlanta, GA 30334-1300<br>(404) 656-3300<br><br>*Counsel for the State of Georgia* |

Derek Schmidt
*Attorney General of Kansas*
Jeffrey A. Chanay
Office of the Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612
(785) 296-2215

*Counsel for the State of Kansas*

Bill Schuette
*Attorney General of Michigan*
G. Mennen Williams Building, 7th Fl.
525 W. Ottawa St.
P.O. Box 30212
Lansing, MI 48909
miag@michigan.gov
(517) 373-1110

*Counsel for Bill Schuette, Attorney General of
the State of Michigan, on Behalf of the
People of Michigan*

Timothy C. Fox
*Attorney General of Montana*
Lawrence VanDyke
Timothy C. Fox
Office of the Attorney General
Department of Justice
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026

*Counsel for the State of Montana*

Jon Bruning
*Attorney General of Nebraska*
Katherine J. Spohn
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683

*Counsel for the State of Nebraska*

Michael DeWine
*Attorney General of Ohio*
Jennifer L. Pratt
Office of the Attorney General
30 E. Broad St., 14th Floor
Columbus, OH 43215
(614) 728-4948
(866) 452-0269 (fax)

*Counsel for the State of Ohio*

Greg Abbott
*Attorney General of Texas*
John Reed Clay, Jr.
Office of the Attorney General
300 W. 15th Street
Austin, TX 78701
(512) 936-1342
(512) 936-0545 (fax)

*Counsel for the State of Texas*

Patrick Morrisey
*Attorney General of West Virginia*
Elbert Lin
State Capitol Complex
Building 1 Room 26-E
Charleston, WV 25305
(304) 558-2021
(304) 558-0140 (fax)

*Counsel for the State of West Virginia*

February 11, 2014

## STATEMENT PURSUANT TO D.C. CIRCUIT RULE ECF-3

Pursuant to D.C. Circuit Rule ECF-3(B), the undersigned certifies that

counsel for all of the State Plaintiffs-Appellants consent to the filing of this brief.

/s/ Patrick Wyrick

February 11, 2014                    Patrick Wyrick

34

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i), and the order of this court dated December 20, 2013 [Dkt. #1471629], because the brief contains 6,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Baskerville 14-point font.


                                        /s/ Patrick Wyrick
February 11, 2014                       Patrick Wyrick

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

<u>/s/ Patrick Wyrick</u>

February 11, 2014                                   Patrick Wyrick

36